IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KIM RALSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: |
| | ) | 1:09-CV-379-MHT |
| U.S. HELICOPTER, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (CORRECTED)**

Ann C. Robertson
Susan Donahue
WIGGINS, CHILDS, QUINN & PANTAZIS
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500


Bobbie S. Crook
367 S. St. Andrews Street
Dothan, Alabama 36301
(334) 671-8062

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KIM RALSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: |
| | ) | 1:09-CV-379-MHT |
| U.S. HELICOPTER, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (CORRECTED)

### TABLE OF CONTENTS

I.     PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    PLAINTIFFS' STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    PLAINTIFF'S WORK HISTORY AT US HELICOPTER . . . . . . . . . . . . . . . . 2

    B.    PLAINTIFF'S EDUCATION AND WORK EXPERIENCE BEFORE
       US HELICOPTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    PLAINTIFF'S PAY AT US HELICOPTER . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    D.    PLAINTIFF'S COMPLAINTS ABOUT DISCRIMINATION
       IN HER WORKPLACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.    February 23, 2003 Complaint to Dick Joyce . . . . . . . . . . . . . . . . . . . 7

        2.    February 23, 2004 complaint to George Evans . . . . . . . . . . . . . . . . . . 7

        3.    February 25, 2004 Complaint to Kim Durden . . . . . . . . . . . . . . . . . . . 7

i

    4.     August 2, 2006 Complaint to Kim Durden about Kevin Brion ........ 8

    5.     Complaints to George Evans about not being allowed to attend production meetings .................................... 9

    6.     Complaints to Lou Ann Falkenstein in 2007 .................... 10

    7.     Complaints at the time of Ralson's termination in 2008 ........... 10

E.    PLAINTIFF'S COUNSELING AND DISCIPLINES ..................... 10

    1.     April 3, 2003 Memo for the Record re Larry Anderson ............. 10

    2.     July 24, 2003 Letter of Warning ............................... 11

    3.     February 24, 2004 Letter of Suspension ........................ 11

    4.     May 15, 2006 Letter of Suspension ........................... 12

    5.     August 8, 2006 Record of Counseling ......................... 12

    6.     March 4, 2008 Record of Counseling .......................... 13

F.    PLAINTIFF'S TERMINATION ..................................... 13

G.    COMPROMISED CREDIBILITY OF BRENT HOHBACH AND KIM DURDEN ................................................. 17

H.    PLAINTIFF'S COMARATORS ..................................... 19

    1.     George Evans ............................................. 19

    2.     Ed White ................................................ 20

III.    STANDARD OF REVIEW ............................................ 21

IV.    LEGAL ARGUMENT ................................................ 22

A.    TITLE VII DISCRIMINATION AND EPA CLAIMS ................... 22

    1.     Ralston's Disparate Treatment in Pay/EPA claim survives summary judgment. ........................................ 22

ii

2.   Ralston's prima facie case of sex discrimination in pay and
     unlawful pay disparity.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

3.   Defendant's reasons for paying Ralston less than White and Evans
     are pretexts for discrimination in pay and for unfair pay
     disparity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

4.   US Helicopter intentionally paid Ralston less than both Evans
     and White because of her gender.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

5.   US Helicopter's "factor other than sex" argument for paying
     Ralston less than both Evans and White is not credible.  . . . . . . . . . . . 32

B.   DISPARATE TREATMENT IN TERMS AND CONDITIONS OF
     EMPLOYMENT/HOSTILE WORK ENVIRONMENT CLAIM  . . . . . . . . . . 33

1.   Being disciplined after complaining about discriminatory    \
     behavior by male employees.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

     a.   July 23, 2003 Letter of Warning and February 25, 2004
          Letter of Suspension  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

     b.   Pre-July 2003 Complaints and Disciplines  . . . . . . . . . . . . . . . 38

     c.   August 6, 2006 Record of Counseling  . . . . . . . . . . . . . . . . . . . 40

     d.   May 15, 2006 Letter of Suspension  . . . . . . . . . . . . . . . . . . . . . 41

2.   Being subject to abusive language and behavior from male
     employees who did not subject other male employees to
     this behavior  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

3.   Not allowed to attend meetings that other foreman attended  . . . . . . . . 43

C.   DISPARATE TREATMENT/TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . 44

D.   TITLE VII/EPA RETALIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KIM RALSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: |
| | ) | 1:09-CV-379-MHT |
| U.S. HELICOPTER, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (CORRECTED)

Plaintiff, through undersigned counsel, opposes defendant's Motion for Summary Judgment (Doc. 26) as follows:

### I.   PROCEDURAL BACKGROUND

Plaintiff Kim Ralston filed her complaint against U.S. Helicopter a/k/a Helicopter Support Company, and Bell Aerospace Services, Inc., on April 24, 2009, claiming sex/gender discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000(e) *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a (hereinafter "Title VII"); and violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), as amended ("EPA"). (Doc. 1). On July 8, 2009, this Court granted defendant's motion in which it argued that it had been improperly named in the Complaint and that U.S. Helicopter is the proper name for defendant. (Doc. 21). Defendant US Helicopter filed its Motion for Final Summary Judgement ("Mot./SJ") (Doc. 26) on February 17, 2010, to which plaintiff now responds in opposition.

## II.   PLAINTIFF'S STATEMENT OF FACTS

### A.   PLAINTIFF'S WORK HISTORY AT US HELICOPTER

Plaintiff Kim Ralston began her employment with US Helicopter on May 29, 2001 as a Production Control (PC) processor. Payroll Change Notice for Kim Ralston (Doc. 26-5). Her pay was $9.76/hr. *Id.* On May 31, 2006, Ralston applied for the position of Data Entry Clerk in the Materials Logistical Department, and was offered the position, but she declined it. E-mail from Kim Ralston to Kim Durden dated May 31, 2006 (Doc. 26-35). On May 15, 2007, Ralston applied for the position of Production Control Foreman. Letter from Kim Ralston to Kim Durden dated May 15, 2007, attached hereto as Exh. 1; Job Posting for Production Control Foreman, attached hereto as Exh.2. Ralston was offered the position and accepted it at the salary of $40,500 per year. Letter from Kim Durden to Kim Ralston dated June 21, 2007 (Doc. 26-7); Payroll Change Notice for Kim Ralston dated June 21, 2007, attached hereto as Exh. 3. *See* Section II.C., below, for more facts on Ralston's pay.

Ralston's employment with US Helicopter was terminated on March 28, 2008. Letter from Keith West and Brent Hohbach to Kim Ralston dated March 28, 2008 (Doc. 26-18). However, because Ralston reported that US Helicopter was charging the government for new fuel cells when it was actually installing refurbished fuel cells on the helicopters, she was placed on administrative leave so that her report could be investigated. Ralston Dep. 51:8-12, 53:17-54:10; Falkenstein Dep. 161:15-162:5.[1]  At the time of her March termination, Ralston also complained about sex

---

[1]Depositions in this case are cited as follows: Deposition of Kim Ralston ("Ralston Dep."), attached hereto as Exh. 4; Deposition of Lou Ann Falkenstein ( "Falkenstein Dep."), attached hereto as Exh. 5; Deposition of Kevin Cordes ("Cordes Dep."), attached hereto as Exh. 6; Deposition of Kimberly Durden ("Durden Dep."), attached hereto as Exh. 7; Deposition of George Evans ("Evans Dep."), attached hereto as Exh. 8; Deposition of Brent Hohbach

2

discrimination. Statement Regarding the Termination of Ms. Kim Ralston from USH, attached hereto as Exh.12; Memorandum of Record from Kum Durden dated March 28, 2008, attached hereto as Exh. 13. Diane Husband (Corporate Human Resources) said she would look into that also, but the defendant did not. Declaration of Kim Ralston, attached hereto as Exh. 14, ¶ 106. On June 5, 2008, her administrative leave ended, and she received a letter of termination. Letter from Keith West to Kim Ralston dated June 5, 2008 (Doc. 26-22). *See* Section II.C., below, for facts about Ralston's pay.

## B.    PLAINTIFF'S EDUCATION AND WORK EXPERIENCE BEFORE US HELICOPTER.

At the time of her deposition in February of 2010, Ralston lacked one quarter of having a 4-year degree in business with an emphasis in information technology. Ralston Dep. 7:12-18. Ralston plans to transfer to Troy State University to complete her last semester. Ralston Dep. 8:7:23-8:4. Ralston has an associates degree from Kaplan University in web design with an emphasis on business. Ralston Dep. 7:12-22.

Ralston's first job after high school was as a team leader for R.G.I.S., a company based in Michigan that contracts to do inventory for large stores worldwide. Ralston Dep. 9:11-10:16. She worked for R.G.I.S. from about 1986 to 1991. Ralston Dep. 11:8-12. In 1991, Ralston took a job offered to her at Food World where she started as a cashier and was promoted to head cashier and then to assistant front end manager in around 1993 or 1994. Ralston Dep. 13:12-15:7. At Food World Ralston supervised and trained about 20 to 30 cashiers. Ralston Dep. 16:12-17:4. Ralston left Food World in 2001 to begin her employment at US Helicopter. Ralston Dep. 16:2-8.

---

("Hohbach Dep."), attached hereto as Exh. 9; Deposition of Harwell Wilson ("Wilson Dep."), attached hereto as Exh. 10; Deposition of Larry Ward ("Ward Dep."), attached hereto as Exh. 11.

## C.    PLAINTIFF'S PAY AT US HELICOPTER

On June 23, 2007, Ralston was promoted to Production Control Hub Foreman at a salary of $40,500/yr. Payroll Change Notice for Kim Ralston , attached hereto as Exh. 14; Job Description for Production Control Foreman, attached hereto as Exh. 15. Ralston  was interviewed by Kevin Cordes, the Production Control Manager, who recommended her for the position and told her the salary would be $48,000/yr. Ralston Dep. 47:16-48:17; Cordes Dep. 29:20- 30:1; Interview Report on Kim Ralston for PC Hub Foreman (Doc. 26-27). Cordes told her that Willy Wilson would have the final determination of her salary. Ralston Dep. 47:16-48:17. Ralston told Cordes that Wilson discrimnates against women. *Id.* Cordes replied that he had told Wilson that he strongly felt that Ralston was well worth $48,000. *Id.* When the position was offered to her by Kim Durden, the Human Resources Manager, Durden told her that the salary would be $40,500/hr. Ralston Dep. 47:16-48:17. Before she signed the contract accepting the position, she explained that this was not the salary she was quoted. Ralston Dep. 47:16-48:17; Declaration of Kim Ralston ("Ralston Decl."), attached hereto as Exh. 16, ¶ 127. Durden informed her that Willy Wilson, the General Manager, had a man in mind for the position so Ralston could take the position at $40,500 or not take it at all. Ralston Dep. 47:16-48:17; Ralston Decl. ¶ 127.   Durden told Ralston that she and Cordes had fought to get Ralston the position because Ralston knew the Production Control Hub inside and out. Ralston Decl. ¶ 127. She accepted the position in spite of the salary. Ralston Decl. ¶ 127. Ralston told Durden that she was going to take the position because she did not want to be discriminated against because she is a woman, and she was going to do the job. Ralston Dep. 47:16-48:17.  She asked Durden to research the salary because she had been told that the salary would be $48,000. Ralston Decl. ¶ 127. Durden told her that she had to accept the position that day so that she could

4

post that the position had been filled. Ralston Decl. ¶ 127. Durden agreed to look into the salary issue and get back with her, but Ralston heard nothing further from Durden about it. Ralston Decl. ¶ 127.

On August 1, 2007, Ralston spoke with LouAnn Falkenstein, Director of Human Resources and Administration, Durdens' corporate H.R. manager, about the discriminatory pay difference. Ralston Decl. ¶ 129; Durden Dep. 184:20-185:6; Falkenstein Dep. 9:23-10:2; 46:6-13; 116:2-8. Ralston told Falkenstein that she had complained to Durden but that nothing had been done. Falkenstein Dep. 46:14-22.  Durden knew that Ralston had alleged that her salary was discriminatory. Durden Dep. 186:4-20.  Falkenstein took notes and said that she had not heard anything about the situation and had not talked with Durden about it.  Ralston Decl. ¶ 130. Falkenstein said she would look into the situation and find out why the salary was not as quoted and then get back to her and tell her what they were going to do about it.  Ralston Decl. ¶ 130.  When Ralston talked to Falkenstein again in September of 2007, Falkenstein said that she was still investigating the issue. Ralston Decl. ¶ 130. Falkenstein understood that when Ralston complained to her about not receiving fair pay that those conversations could be a triggering point for an accusation of retaliation if something adverse was done to her as part of the response.  Falkenstein Dep. 54:5-14. Durden told Falkenstein that they had told Ralston that her salary would be reviewed in six months after being promoted to foreman. Falkenstein Dep. 116:11-22.

On or about January 7, 2008, Duren called Ralston into her office and told Ralston that they had looked at the pay and because Ralston had been in the position for six months that they were raising her pay to $46,342.40 as of December 2, 2007. Ralston Decl. ¶ 131.  Durden was told by Falkenstein to change Ralston's pay. Durden Dep. 187:10-16.   Ralston's pay was not increased

5

back to when she was hired, it was increased back to when she would have gotten her six month review. Durden Dep. 179:20-180:4. In other words, Ralston's got a raise on February 29, 2008, but it was effective back to December 22, 2007. Durden Dep. 187:14-19. When Ralston asked why this took six months, Durden explained that she had already told Ralston that she would be evaluated in six months. Ralston Decl. ¶ 132. Ralston explained that she had never been told anything about a six-month evaluation. Ralston Decl. ¶ 132. Ralston stated that she had been told that the company was investigating why she had been quoted one salary, but started at a lower salary. Ralston Decl. ¶ 130. Ralston continued to complain that she was still being given discriminatory pay. Ralston Decl. ¶ 132. Durden told Ralston to accept what she got. Ralston Decl. ¶ 132.

Kevin Cordes was removed as her supervisor in December of 2007, and Brent Hohbach became her manager. Cordes Dep. 43:11-20.

In February of 2008, the annual increases were given out, and Ralston's raise was 3.5%. EOCC Charge, page 2(Doc. 26-23); Payroll Change Notice for Kim Ralston, attached hereto as Exh.14. Keith West, the Operation Manager of Production Control told her that she had just received a huge raise because of the investigation over her starting salary and that, therefore, she was not going to be given the percentage increase he gave to everyone else. EEOC Charge, page 2 (Doc. 26-23); Ralston Decl. ¶ 134. Ed White, a male Production Control foreman, was given a 5% annual raise. Payroll Change Notice for Ed White, attached hereto as Exh. 14. Both White and Ralston were PC foremen, and White supervised three employees in production control just as Ralston did. Ralston Decl. ¶ 133. *See* Section II.H.2. for more facts on Ed White as Ralston's comparator.

**D.    PLAINTIFF'S COMPLAINTS ABOUT DISCRIMINATION IN HER WORKPLACE.**

Ralston complained to Lou Ann Falkenstein, Drector of Human Resources for Bell

Aerospace Services and defendant's 30(b)(6) witness, about discrimination in her workplace 2007

as well as about some of the issues regarding compliance with government contracts. Falkenstein

Dep.89:5-18. Ralston's complaints about sex/gender discrimination in the workplace began four (4)

years' earlier and continued up to and including her termination as follows:

### 1.    February 23, 2003 Complaint to Dick Joyce

On February 23, 2003, Dick Joyce, owner of the company at the time, wrote a "Memorandum

of Record' regarding Kim Ralston stating that he had learned that Ralston was keeping a notebook

"noting incidents of [her] being the victim of harassment by [her] direct supervisor and other

employees." Memorandum of Record by Dick Joyce dated February 23, 2003, attached hereto as

Exh.17. In the memorandum, a handwritten notation states, "Yes, Sometimes!" to the question, "Do

you feel that you have been a victim of harassment?" *Id.* Joyce's handwritten note states that

Ralston reported to him that "H.R. and her manager were responsive to her complaints but it hadn't

gotten better." *Id.* Joyce further states in his notes that "I told her that I was satisfied as long as staff

responded to her and that she had no legal issues." *Id.*

### 2.    February 23, 2004 Complaint to George Evans

On February 23, 2004, Ralston wrote a memo to George Evans describing an incident

involving Larry Anderson and his behavior towards her, including Anderson's loud, "ugly" talk.

Handwritten Note "To Whom It May Concern", attached hereto as Exh. 18; Ralston Decl. ¶ 9.

### 3.    February 25, 2004 Complaint to Kim Durden

On February 25, 2004, Kim Durden wrote a memo to the file regarding Kim Ralson's letter

of suspension dated February 24, 2004. Memo to file from Kim Durden dated February 25, 2004,

attached hereto as Exh. 19; Letter of Suspension for Kim Ralston dated February 24, 2004 (Docs.

26-8 and 26-11). *See* Section II.C.3. for more facts about this suspension. In her memo, Durden states that she and Keith West counseled Ralston concerning a "confrontation with Larry Anderson on 23 February 2004." *Id.* Durden records that Ralston "feels that she is being counseled because she is a woman and that she is working in a hostile environment." *Id.* Durden also records that Ralson complained that Larry Anderson "cusses and throws pencils at his computer" and that Marvin Horne "says G.D." and that it offended her. *Id.* Durden records that Ralston stated that "Teri is still doing her little 'sex talk' stuff," but that Teri was getting better about it. *Id.* Evans cannot say why nothing was done to Anderson to stop that behavior. Evans Dep. 30:22-31:11.

### 4.   August 2, 2006 complaint to Kim Durden about Kevin Brion

On August 2, 2006, Ralston wrote an e-mail to Kim Durden complaining that Kevin Brion had said to her in her workplace that he couldn't get a "Fuckin" thing done over here. E-mail from Kimberly Ralston to Kim Durden dated August 2, 2006, attached hereto as Exh. 20. Evans testified that he does not recall writing Ralston up when she complained that Brion had cursed at her and told that "nobody does a fucking thing around here" and got excited when she told him about it. Evans Dep. 11:2-11. Evans states that if he had written Ralston up for this, it would have been wrong. Evans Dep. 11:12-18; Record of Counseling for Kim Ralston dated August 8, 2006, attached hereto as Exh. 22. Evans does not know if Brion was written up for using this language with Ralson. Evans Dep. 17:13-17. Evans cannot think of any reason why Brion would not have gotten written up for using that kind of language with Ralston. Evans Dep. 17:18-22. Evans cannot recall if he investigated the complaint Ralston made about Brion's language. Evans Dep. 25:14-21.

Lou Ann Falkenstein testified that she could think of no time where it would be appropriate for a male co-worker to tell somebody that "nobody does any fucking work around here."

Falkenstein Dep. 30:3-7. Falkenstein also testified that if a female employee reported such behavior on the part of a male co-worker, that it would be improper for the supervisor to tell her that she should just "let it go." Falkenstein Dep. 30:14-17.

### 5. Complaints to George Evans about not being allowed to attend production meetings.

When Brent Hohbach held production meetings in the first thing in the morning, the people who attended were the production foremen, production supervisor, and quality foremen. Hohbach Dep. 52:1-8. That meeting was at 7:00 a.m. or 7:30 a.m. every morning. *Id.* About 15 to 18 people attended. *Id.* Other than Ralston, there were no other females who were in attendance. Hohbach Dep. 53: 6-15. Ralston stopped coming to these meetings at Hohbach's request. Hohbach Dep. at 53:16-18. Hohbach testified that he asked Ralston not to come to the meetings because she was a foreman under George Evan's supervision and any tasks that would have come to Ralston through these meetings could be relayed to her by Evans. Hohbach Dep. 55:5-17. However, Hohbach also testified that Evans did not do the same tasks as Ralston and that there was an exchange of ideas and information about the interactions among the foremen and their departments. Hohbach Dep. 56:15-57:13. The purpose of the production meetings was to allow people to exchange ideas and find out where everybody was in the production process so that they could work together and be knowledgeable about how production could be done. Cordes Dep. 41:12-17.

Ralston complained to George Evans about being excluded from the meetings, but Evans equivocates that Ralston's statement that she was not allowed to attend the meetings was a statement and not a complaint. Evans Dep. 87:17-88:12. Evans did not investigate why Ralston was not allowed to go to the meetings. Evans Dep. 88:13-90:16. Ralston was the only female foreman at

the plant at the time.  Evans Dep. 90:10-13.

### 6.  Complaints to Lou Ann Falkenstein in 2007

Ralston complained to Falkenstein about not being allowed to attend production meetings. Falkenstein Dep. 128:10-15.

### 7.  Complaints at the time of Ralston's termination in 2008.

On the day she was terminated, Ralston wrote out her response to the termination while at her termination meeting.  Hohbach Dep. 123:2-8; Letter from Keith West and Brent Hohbach dated March 28, 2008, and Kim Ralston's handwritten response (Doc. 26-18).  When Ralston wrote that she had been discriminated against by George Evans for five years, Hohbach did not investigate Ralston's allegations.  Hohbach Dep. 123:9-23.  It was not Hohbach's understanding that there was supposed to be an investigation of an allegation of discrimination.  Hohbach 124:9-16.   Ralston alleges in her response to her termination that Hohbach had been discriminating against her. Hohbach Dep. 125:5-15.  Hohbach did not investigate Ralston's allegation against him because he did not believe it.  Hohbach Dep. 125:5-126:15.  Hohbach was not given any training when he took over his supervisory position on how to go about terminating someone.  Hohbach Dep. 128:16-20.

Falkenstein admitted that the statements Ralston made on her termination letter were protected speech since she was complaining about being harassed in her workplace.  Falkenstein 152:9-153:8.

## E.  PLAINTIFF'S COUNSELING AND DISCIPLINES

### 1.  April 3, 2003 Memo for the Record re Larry Anderson

Evans wrote a Memo to the Record for Kim Ralston dated April 2, 2003, regarding a "heated discussion" between Ralston and Larry Anderson.  Evans Dep. 26:9-13; Memo for Record for Kim

Ralston dated April 2, 2003, attached hereto as Exh. 22. Evans cannot remember anything about this incident except what is written on the Memo for Record. Evans Dep. 26:9-19.

### 2.    July 24, 2003 Letter of Warning

Evans wrote a Letter of Warning to Kim Ralston on July 24, 2003. Evans Dep. 27:7-22; Letter of Warning to Kim Ralston dated July 24, 2003 (Doc. 26-10). Ralston wrote on the letter that she had told Evans about Larry Anderson "saying G.D." and also about Debbie LNU's language, "but nothing has been done." Letter (Doc. 26-10).

### 3.    February 24, 2004 Letter of Suspension.

A year after Ralston complained about Larry Anderson's swearing, she was suspended when Larry Anderson again assaulted her with profane language. Letter of Suspension for Kim Ralston dated February 24, 2004 to which Ralston's response is attached (Doc. 26-11). The events leading to this suspension began on February 23, 2004 when Willy Wilson informed Kim Durden that Larry Anderson had discussed with him a "heated discussion" that he had with Kim Ralston concerning work instructions. Memorandum of Record from Kim Durden dated February 24, 2004, attached hereto as Exh. 23. Durden's memorandum accuses Ralston of not following the instructions of her July 24, 2003 Letter of Warning, obviously blaming Ralston for the incident with Larry Anderson. *Id.* Ralston wrote two responses to this letter of suspension – one attached to the letter (Doc. 26-11) and one addressed To Whom It May Concern discussing the incident, attached hereto as Exh. 18. In both of her statements, Ralston complains that she is working with a "hostile person" who has a "bad mouth" who gets upset and "throws things at his computer" and "talks down to people." (Doc. 26-11). Ralston states that she believes "Larry gets by with his problem when he started the argument" and that she has spoken to George Evans about this. *Id.* In her statement "To Whom It

11

May Concern", Ralston discusses the incident and reports that she has spoken to Evans about "Larry getting upset and throwing things." Exh. 18, hereto.

### 4.     May 15, 2006 Letter of Suspension.

Ralston was suspended for three days on May 15, 2006.  Letter of Suspension for Kim Ralston (Doc. 26-9).  Hartwell ("Willy") Wilson signed the letter but does not recall if Ralston was asked to make any comments before she was disciplined.  Wilson Dep. 26:10-17. Wilson does not remember details of Ralston's suspension beyond what is written on the letter of suspension.  Wilson Dep. 45:16-46:4.He does not recall how this letter of suspension came about.   Wilson Dep.: 49:18:50:9. The letter of suspension does not document that Wilson ever spoke with Ralston or that she was given an opportunity response to these allegations other than Wilson's handwritten note that "employee will provide comments if necessary upon return to work 19 May 06." Letter of Suspension (Doc. 26-9); Wilson Dep. 50:10-17.

Neither Brent Hohbach, Kevin Cordes or LouAnn Falkenstein believes that saying something is a "dog and pony show" is a derogatory remark.  Hohbach Dep. 88:12-15; Cordes Dep. 57:4-10; Falkenstein Dep. 166:3-18.

US Helicopter's policy is to make sure you have an employee's version of events before you suspend him or her.  Durden Dep. 100:21-101:2.

### 5.     August 8, 2006 Record of Counseling.

Evans wrote a Record of Counseling for Kim Ralston on August 8, 2006.  Evans Dep. 31:21-32:5; Record of Counseling for Kim Ralston dated August 8, 2006, with Kim Ralston's response, attached hereto as Exh. 21.  Evans does not recall what precipitated Ralston's conversation with him in which he alleges that she had an "uncontrolled outburst of words." Evans Dep. 33:13-19.  Evans

does not record how Ralston lost her temper. Evans Dep. 35:12-15. However, the counseling records say that she came into his office on the previous Tuesday, and Ralston's e-mail to Kim Durden dated Wednesday, August 2, 2006, asks Durden for help regarding Kevin Brion's statement to her at her work station after asking her for a document that he could not get "a fucking thing done over here." E-mail from Kim Ralston to Kim Durden dated August 2, 2006, attached hereto as Exh. 20.

### 6.    March 4, 2008 Record of Counseling

The Record of Counseling dating March 4, 2008 regarding Kim Ralston is not signed either by her supervisor or herself. Record of Counseling for Kim Ralston dated March 4, 2008, attached hereto as Exh. 24. Hohbach testified that he sent the original with his signature on it to H.R., but he does not know where that original is. Hohbach Dep. 98:2-8. He did not follow the instruction on the document that the document "will not be placed in employee's personnel file unless further disciplinary action is required" because it does not say that it cannot be placed in the employee's personnel file. Hohbach Dep. 100:7-18; Record of Counseling dated March 4, 2008 (Doc. 26-17).

Falkenstein testified that she had seen the March 4, 2008 Record of Counseling, but had never seen a signed copy of it. Falkenstein Dep. 149:2-150:4. Falkenstein never questioned anyone about why there was not a signed copy of this counseling record. Falkenstein Dep. 150:16-20. *See* Section F., below for more facts on the March 4, 2005 Record of Counseling.

### F.    PLAINTIFF'S TERMINATION

Brent Hohbach was the person who told Ralston she was fired. Hohbach Dep. 78:13-18. Hohbach made the decision to terminate Ralston and that no one else was involved in the decision. *Id.* At the time she was fired, Hohbach had been Ralston's supervisor for about three months.

Ralston overheard Hohbach say to several foreman as a production meeting was beginning, "Women don't need to be ni authority positions." Ralston EEOC Charge, p. 3 ( Doc. 26-23).

At the first production meeting Hohbach held after he became her supervisor, Hohbachlooked straight at her and said, "Someone is gonig to get fired by me." Ralston Decl. ¶ 98. That was the last production meeting Ralston attended because Hohbach told her not to come to the meetings any more. Ralston Dec. ¶ 98.

Hohbach wrote Ralston up for insubordination for the incident on March 4, 2008, when she allegedly refused to do a work assignment given to her by Evans. Hohbach Dep. 82:14-23. *See* section II.E.6., above, for more facts on this Counseling Record. Hohbach got witness statements from George Evans, David Leatherwood and Cynthia LNU (unreadable). Hohbach Dep. 107:8-16; Memos from George Evans, David Leatherwood and Cynthia LNU, attached hereto as Exh. 25. Hohbach does not recall if he got a statement from Ralston about the incident when he was investigating it before he fired her. Hohbach Dep. 112:10-14. Hohbach talked to Keith West about the incident and told West that he thought it was time to terminate Ralston based on what happened in May of 2006 and what had been written in Ralston's file. Hohbach Dep. 83:1-15; Letter of Suspension for Kim Ralson dated May 15, 2006 (Doc. 26-9). Upon reviewing the Letter of Suspension, Hohbach believes that it was some other document in Ralston's file that convinced him to terminate her because it said that a further incident of insubordination may or will result in termination. Hohbach Dep. 134:2-11. Hohbach testified that he based his termination of Ralston on a document dated May 6th that talked about insubordination. Hohbach Dep. 137:19-23. Hohbach had never seen the letter dated June 5, 2008, which is the final termination sent to Ralston and signed by Keith West and Lou Ann Falkenstein. Holbach Dep. 141:9-11; Letter from Keith West and Lou

14

Ann Falkenstein to Kim Ralston dated June 5, 2008 ("June 2008 termination letter") (Doc. 26-22).
This letter contains the statement that "your 'letter of suspension' in May 2006 notified you that
further occurrence [of insubordination] would result in discharge."  June 2008 termination letter
(Doc. 26-22).

Hohbach testified that he did not tell anyone that he decided to terminate Ralston in March
of 2008 because of her disciplinary suspension for insubordination which allegedly occurred in May
of 2006.  Hohbach Dep. 141:19-23.  Of course, this statement is simply untrue since the letter of
termination is also signed by Keith West and was presented to Ralston in the presence of Kim
Durden.  The reason given in Letter of Suspension for Kim Ralston dated May 15, 2006, for her
suspension is not "insubordination" but "[t]hreatening, intimidating, coercing or interfering with or
making defamatory, vicious, or malicious statements against any employee, customers, the company
or its products or services."  Letter of Suspension dated May 15, 2006 (Doc. 26-9).

Evans testified that he wrote a memorandum for the record to Brent Hohbach regarding Kim
Ralston on March 26, 2008.  Evans Dep. 96:7-14; Memorandum for Record from George Evans to
Bernt Hohbach dated March 26, 2008, attached hereto as Exh. 26.  In the memo, Evans relates an
incident on March 25, 2008, in which he and Ralston discussed who was going to write the process
for closing Material Exhibits.  *Id.*  Evans admits that it may not be expressed in his memo that
Ralston told him that she would not write the process.  Evans Dep. 103:6-16.  Ralston wrote a
statement regarding this incident in which she states that Evans told her that he would write the draft.
Evans Dep. 104:9-15.  Statement by Kim Ralston regarding March 25, 2008 discussion with Evans,
attached hereto as Exh. 27.  Evans never wrote the process and has no idea when it got written.
Evans Dep. 104:22-105:3.  Evans testified that Hohbach did not direct him to write the process, but

15

told him that it needed to be written. Evans Dep. 105:15-106:5. However, Ward testified that Hohbach told Evans to write it at a meeting set up to discuss writing close-out procedures. Ward Dep. 27:13 - 28:2. Hohbach indicated that the process needed to be written as soon as possible. Ward Dep. 30:6-8. Terri Griffin in accounts payable did the process without written instructions. Ward Dep. 31:1-33:19. Ward heard Evans being instructed to write the process by his boss. Ward Dep. 34:3-7. The process was finally written up ten months later by Lennon Kilpatrick and Steve Soler. Ward Dep. 30:15-18; 35:4-18. Evans knew the process, and Ward has no idea why he could not write it. Ward Dep. 37:7-12. At the meeting Hohbach asked Evans if he could write the process and Evans said yes, but it did not get done. Ward Dep. 39:6-15. Evans was not written up, suspended or otherwise disciplined for his insubordination in not completing the task his supervisor asked him to complete.

Kim Durden had to sign off on Ralston's termination. Hohbach Dep. 84:1-3. Hohbach talked to Durden about terminating Ralston and asked Durden to see Ralston's personnel file where he read the suspension letter from May of 2006 and other documents going back to 2004. Hohbach Dep. 85:6-23. Hohbach did not discuss Ralston's termination with George Evans, her direct supervisor. Hohbach Dep. 88: 16-19; Evans Dep. 93:23-94:4. After Ralston's termination, no one discussed the termination with Hohbach. Hohbach Dep. 142:7-11. In other words, the promised investigation by Husband and Falkenstein was not done.

During her administrative leave, attorneys representing US Helicopter interviewed her about the report she had made regarding the fuel cells, but not her discrimination charges. Ralston Dep. 54:11-55:8.

Falkenstein signed Ralston's June 2008 letter of termination and stated that Ralston was

16

written up in May of 2006 and told that if she was insubordinate again she would be terminated. Falkenstein 164:10-15; June 2008 Letter of Termination (Doc.26-22).

During her discussion with Falkenstein about her severance, Ralston felt pressured to sign a confidentiality agreement that Ralston did not want to sign. Ralston Dep. 57:6-58:9; Confidentiality Agreement (Doc. 26-19). She felt pressured to sign the agreement and was followed all the way down the stairs by an attorney for the company who told her she had to sign it. *Id.* Finally, she told the gentleman whose name she does not recall that she was a woman, and she wanted him to leave her alone. *Id.*

After Ralston was terminated, Bobby Gunter, a male who lost his foreman's job because there was no working for him, took her place temporarily until the position was filled permanently. Hohbach Dep. 94:3-19.

## G.    COMPROMISED CREDIBILITY OF BRENT HOHBACH AND KIM DURDEN

Kim Durden admitted during her deposition that she had a sexual relationship with Brent Hohbach when they were both employed at US Helicopter. Durden Dep. 61:21-63:11. She admitted that having a sexual relationship with Hohbach was inappropriate. Durden Dep. 64:1-4. Durden testified that she had not spoken to nor seen Hohbach since they day they were forced to resign. Durden wrote her letter of resignation in November of 2008 after she was told that she would be terminated because of allegations that she and Hohbach were involved in an inappropriate relationship Durden Dep. 37:1-38:4. She denied during her deposition that any of these intimate meetings occurred while at work, but admitted that she and Hohbach had an inappropriate relationship. Durden Dep. 64: 17-19. She was told that she would be terminated for an inappropriate relationship and improper use of the Internet or e-mail with Hohbach on her company

Blackberry. Durden Dep. 65: 14-66:1.

Hohbach resigned from US Helicopter in November of 2008 when there were allegations of an inappropriate relationship between himself and Kim Durden. Hohbach Dep. 61:9-18; 63: 18-23. If he had not resigned, he would have been terminated. Hohbach Dep.61:9-12. He resigned because he did not want to answer whether the allegations were true, but he testified in his deposition that the allegations were not true.[2] Hohbach Dep. 65:5-10.

On a Saturday when Ralston was at work, one of the mechanics reported to her that he had seen Brent Hohbach walking to the human resources area with Kim Durden. Ralston Dep. 41:16-42:16. Ralston had also seen Hohbach and Durden walking in that direction. *Id.* The mechanic told Ralston that the door to the Human Resources office was locked, and Ralston had seen them both go into that office. *Id.*

Falkenstein received a written complaint from the secretary to the General Manager at US Helicopter alleging an inappropriate relationship between Kim Durden and Brent Hohbach. Falkenstein 75:18-76:7. Falkenstein investigated the accusation. Falkenstein Dep. 81:19-82:1. Before Falkenstein received the written complaint, Ralston had reported to her that there were rumors that Hohbach and Durden had an inappropriate relationship, but Falkenstein did nothing in response to Ralston's report. Falkenstein Dep.92:10-93:13. Falkenstein also received a comment from one of the mechanics about a possible inappropriate relationship between Hohbach and Durden and that they had been in the locked HR office after hours. Falkenstein Dep. 95:2-22. Falkenstein

---

[2]Apparently Hohbach treats women one of two ways – as disposable sex objects (Durden) or a subhuman group not suitable for "authority positions" (Ralston). Hohbach's sexually discriminatory attitude is reflects by his treatment of both Durden and Ralston. Hohbach is apparently such a sexist that he was not chivalrous enough to admit under oath his sexually inappropriate behavior.

received the written complaint from the secretary and heard about the rumors from Ralston and the mechanic about Hohbach and Durden's possible inappropriate relationship at about the same time which would have been before Ralston was terminated in March of 2008. Falkenstein Dep. 98:10-13; 95:17-96:8.

When Falkenstein asked Hohbach about a possible inappropriate relationship with Durden, he denied it. Falkenstein Dep. 99:6-11. Durden also denied the possible inappropriate relationship when Falkenstein asked her about it. Falkenstein Dep. 100:18-19. At that point Falkenstein closed her investigation. Falkenstein Dep. 104:17-105:6. Falkenstein recognized at her deposition that Durden had lied to her earlier about her relationship with Hohbach. Falkenstein Dep. 136:22-137:1. In her deposition, Falkenstein admitted that Hohbach and Durden had not been truthful with her. Falkenstein 151:4-11. Falkenstein confirmed that it is against the rules to lie to someone during an investigation and to have sex at the workplace. Falkenstein 251:9-13. Falkenstein relied on Durden to investigate Ralston's complaints about sex discrimination in her workplace. Falkenstein Dep. 146:15-147:19.

## H.    PLAINTIFF'S COMPARATORS

### 1.    George Evans

Ralston replaced George Evans as Production Control Foreman. Durden Dep. 129: 3-10. When Evans was Production Control Foreman, his pay was $48,925.03 (Doc. 26-34).

Evans studied for a general education degree while he was in the military, but did not receive any kind of degree. Evans Dep. 47:7-12.

Evans was written up following his annual Performance Appraisal on September 20, 2001 and his supervisory position was taken away and he was reassigned to the Quality Control

19

Department as a Quality Control Inspector and denied an annual raise for 2001. Memorandum for Record regarding George Evans dated September 20, 2001, attached hereto as Exh. 28. He remained in the Quality Control position for a year and was then promoted to Production Control Foreman on September 20, 2002. Payroll Change Notice for George Evans (Doc. 26-33).

On May 1, 2007, Evans completed a performance appraisal for Kim Ralston. Evans Dep. 77:5-14, Performance Appraisal for Kim Ralston, attached hereto as Exh. 29.

Hohbach testified that he does not know if the document that Evans was charged with completing, which became the focus of Ralston's alleged insubordination in refusing to do the task and made the basis of her termination, was ever actually completed. Hohbach Dep. 120:2-4. Hohbach did not know that Jimmy Payne in quality control had told Ralston that the AWR procedure for closing was wrong and that they needed to do it a certain way and that she had put it in her computer and outlined the procedure and the procedure was in her computer at the time the conversation with Evans occurred. Hohbach Dep. 121:15-122:7. This was never brought to his attention. Hohbach Dep. 122:8-9. He has no documentation that he ever talked to Ralston about this incident before he terminated her. Hohbach Dep. 122:20-123:1.

## 2.    Ed White

When George Evans was promoted to Production Control Supervisor, Ed White, Kim Ralston and Bill Salinsky reported to him. Hohbach Dep. 50:17-22. Ralston and White were both Production Control Foremen and Salinsky was the government salvage foreman. *Id.*

When Falkenstein investigated Ralston's complaint about disparity in her pay as a Production Control Foreman, she compared Ralston's pay to Ed White, who was the other Production Control Foreman at the time. Falkenstein Handwritten Notes, attached hereto as Exh. 30; Falkenstein Dep.

109:17-110:14. Falkenstein compared White to Ralston because "[h]e is her peer." Falkenstein Dep. 110:15-111:2. Falkenstein compared White to Ralston because they were both Production Control Foremen, were both salaried and therefore not eligible for overtime, whereas the production foremen were eligible for overtime. Falkenstein Dep. 112:2-9. White's salary was $48,925 effective January 20, 2007. Payroll Change Notice for Ed White, attached hereto as Exh. 31. When Flakenstein made her comparison of Ralston's salary to White's she did not see the forms giving his specific salary despite the fact that Durden had reported to her that Ralston complained to her about this pay inequity. Falkenstein Dep.114:8-115:8.

On February 29, 2008, Ed White received a 5% annual raise, but Ralston received a 3.5% raise. Payroll Change Notices for Ed White and Kim Ralston, attached hereto as Exh. 14.

## III.   STANDARD OF REVIEW

Summary judgment may be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). A genuine issue of material fact will defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986). Summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. *Id.* at 249-252.

In reviewing a motion for summary judgment, a court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. *Id.* at 254-55; *see also Reeves v. Sanderson*

21

*Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. *Celotex*, 477 U.S. at 323 (internal citation omitted).

If the moving party meets this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Ultimately, summary judgment may be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex*, 477 U.S. at 323.

## IV.   LEGAL ARGUMENT

### A.   TITLE VII DISCRIMINATION/EPA CLAIMS

#### 1.   Ralston's Disparate Treatment in Pay/EPA claim survives summary judgment.

Ralston was paid less than both George Evans, whom Ralston replaced as Production Control Foreman when Evans was promoted to Production Control Supervisor, and less than Ed White who was the other Production Control Foreman who reported to Evans when Evans became Production Control Supervisor. Ralston brings her claims of sex discrimination in pay and unfair pay disparity under both Title VII and the EPA.

The EPA requires equal pay for equal work. 29 U.S.C. § 206(d)(1). Title VII looks at sex-

based wage discrimination more broadly and prohibits, for example, discrimination in compensation that is the result of intentional discrimination. 42 U.S.C. § 2000e(h). Most sex-wage claims are brought under both Title VII and the Equal Pay Act, as is the situation in this case. Where this happens the courts have used a variety of burden of proof formats. The 11th Circuit has held in *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992) that, after considering the Supreme Court's decision in *County of Washington v. Gunther*, 452 U.S. 161 (1981) that "the *McDonnell Douglas/Burdine* approach to disparate treatment is the appropriate frame work for evaluating Miranda's claim of gender-based wage discrimination." *Accord Meeks v. Computer Associates International*, 15 F.3d 1013, 1020 (11th Cir. 1994).

"The *McDonnell Douglas/Burdine* framework requires a Title VII plaintiff to establish an intent to discriminate on the part of her employer." *Meeks,* 15 F.3d at 1019. The *Meeks* court explained the burdens of proof for a case of sex discrimination in pay as follows:

> Under the *McDonnell Douglas/Burdine* approach, a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males. *Miranda*, 975 F.2 at 1529. Once a *prima facie* case is established, the defendant must articulate a "legitimate, non-discriminatory reason for the pay disparity." *Id.* (citing *Burdine*, 450 U.S. at 255-56, 101 S.Ct. At 1095). This burden is "exceedingly light"; the defendant must merely proffer non-gender based reasons, not prove them. *Id.* (quoting *Perryman v. Johnson Prod., Inc.,* 698 F.2d 1138, 1142 (11th Cir. 1983)). Once such a justification is advanced, the plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent. In other words, the plaintiff must how that "a discriminatory reason more likely than not motivated [the employer] to pay her less." *Id.* (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. At 1095). Such proof may be direct or circumstantial. *Reichhold Chem.*, 988 F.2d at 1564 (citing *Smith v. Horner*, 839 F. 2d 1530, 839 F.2d 1530, 1536 (11th Cir. 1988)); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502,—, 113 S.Ct. 2742, 2749, 125 L.Ed. 2d 407 (1993) ("[R]ejection of the defendant's proffered

> reasons [for disparate treatment], will *permit* the trier of fact to infer
> the ultimate fact of intentional discrimination . . . ." (Emphasis in
> original).

*Meeks*, 15 F.3d at 1019.

The *Meeks* court further explained the effect of the Supreme Court's decision in *Hicks* on the

plaintiff's burden as follows:

> Our holding in *Miranda*, 975 F.2d at 1518, has been modified slightly
> by the Supreme Court's 1993 decision in *Hicks*, 509 U.S. at ----. 113
> S.Ct. at 2742. In *Miranda* we held that the plaintiff could satisfy her
> Title VII burden by proving *either* that "a discriminatory reason more
> likely than not motivated [her employer] to pay her less, *or* that [the
> employer's] explanation is not worthy of belief." 975 F.2d at 1529
> (emphasis added) (Citing *Burdine*, 450 U.S. at 256, 101 S.Ct. At
> 1095). In *Hicks*, however, the Supreme Court held that only a finding
> of intentional discrimination will satisfy the plaintiff's burden of proof
> under Title VII. 509 U.S. at —, 113 S.Ct. at 2749. "The
> factfinder's disbelief of the reasons put forward by the defendant
> (particularly if disbelief is accompanied by a suspicion of mendacity)
> may, together with the elements of the prima facie case, suffice to
> show intentional discrimination." *Id.* However, although "'[n]o
> additional proof of discrimination is *required*'" to support a finding
> of intentional discrimination, *id.* (quoting *Hicks v. St. Mary's Honor
> Center*, 970 F.2d 487, 493 (8th Circ. 1992) (emphasis added)
> (bracketed material in original)), "rejection of the defendant's
> proffered reasons" does not *compel* judgment for the plaintiff as a
> matter of law. *Id.*

*Meeks*, 15 F.3d at 1019, n. 1.

The *Meeks* court considered the difference between Title VII and the EPA as follows:

> In contrast to Title VII, the EPA establishes a form of "strict
> liability":
>
> > Once the disparity in pay between substantially
> > similar jobs is demonstrated, the burden shifts to the
> > defendant to prove that a "factor other than sex" is
> > responsible for the differential. If the defendant fails,
> > the plaintiff wins. The plaintiff is not require to prove

24

discriminatory intent on the part of the defendant.

*Meeks*, 15 F.3d at 1019.

The 11th Circuit in *Meeks* affirmed the difference between a Title VII claim for sex discrimination in pay and an EPA claim by stating as follows:

> Under the EPA, the onus is on the employer to establish that the pay differential was premised on a factor other than sex. Under Title VII, however, the plaintiff must prove that the employer had a discriminatory intent.  If the evidence is in equipoise on the issue of whether a salary differential is based on a "factor other than sex," the plaintiff is entitled to judgment on her EPA claim.  However, the employer prevails on the Title VII claim.

*Meeks*, 15 F.3d at 1019.

### 2.    Ralston's prima facie case of sex discrimination in pay and unlawful pay disparity.

Ralston has brought evidence that she was unlawfully paid less than both George Evans and Ed White who occupied the same position as she did as Production Control Foreman.  Ralston was promoted to the Production Control Foreman position effective June 24, 2007 at a salary of $40,500/yr.[3]   When Evans was promoted from the position of Production Control Foreman to Production Control Supervisor effective April 28, 2007, his salary went from $48,925.03 to $58,291.00.[4]  There were two Production Control Foreman under Evans' supervision–Ralston and Ed White.[5]  As a Production Control Foreman, White was paid $48,925/yr effective January 20, 2007.[6]

---

[3]Payroll Change Notice for Ralston effective June 24, 2007, Exh. 3, hereto.

[4]Payroll Change Notice for Evans effective April 28, 2007 (Doc. 26-34).

[5]Hohbach Dep. 50:17-22.

[6]Payroll Change Notice for White effective January 20, 2007, Exh. 31, hereto.

25

Thus, the two males who held Ralston's position were paid more than $8,000/yr than she did when all three held the same position in 2007.

White and Evans are proper comparators for Ralston. Beyond the fact that all three of them held the same title in the same year, their responsibilities were comparable. The Production Control foremen control the paperwork required to refurbish the helicopters according to the contracts for that work. Defendant argues that White's responsibilities were "completely different" from Ralston's to be a good comparison because he handled different types of documents in his position than Ralston did in hers. However, when Lou Ann Falkenstein, Director of Human Resources, investigated Ralston's claim of pay disparity when Ralston complained about it, Falkenstein used Ed White as the proper comparator for Ralston because White was "her peer."[7] Both White and Evans supervised three employees each in the Production Control Department.[8]

### 3.   Defendant's reasons for paying Ralston less than White and Evans are pretexts for discrimination in pay and for unfair pay disparity.

Defendant's articulated reasons for paying Ralston less than White are that he had "completely different" responsibilities, that he had "different and greater experience" than Ralston because of White's 14 years in the military as compared to Ralston's previous experience. Defendant downplays Ralston's previous experience at U.S. Helicopter having worked as a Production Control processor there since 2001 which was 6 years before her promotion. During her employment at Production Control, she consistently received excellent reviews for the quality of her work, including a glowing review of her work by George Evans on May 1, 2007, just one month

---

[7]Falkenstein Dep. 110:15-111:2.

before she was promoted. Evans praises her work by saying it is "almost error free", that she has an "unquestionable" knowledge of her job duties. He notes her ability to "move into tasks not traditionally done by an expediter." He acknowledges that she had trained a new employee because Evans was not able to do that training and admits that Ralston, in fact, trained him on his job when he says that she has stated that "she will not train a new Hub Supervisor", but he knows that "she will do what's directed."[9]

Furthermore, Defendant discounts Ralston's previous experience before coming to U.S. Helicopter in which she supervised and trained team members to take inventory for R.G.I.S,[10] as well as discounting her supervisory experience at Food World where she supervised and training about 20 to 30 cashiers in her position as Assistant Front End Manager.[11] Given Ralston's supervisory experience previous to coming to U.S. Helicopter as well as her experience both at R.G.I.S. and at U.S. Helicopter in managing and handling paperwork for inventory and production control processes, Ralston's experience stacks up well beside Evans' and is not different enough to deny that he is a good comparator for her as far as their pay, particularly in light of Falkenstein's comparison of them when she investigated the disparity in their pay.

Defendant's articulated reasons for paying Ralston less than Evans is because Evans had five years' experience in the position previous to Ralston's promotion and had over 20 years of experience in the helicopter industry. However, from Evans' own statement, it was Ralston who trained him to do the job. *See* Performance Appraisal for Kim Ralston, dated May 1, 2007, Exh.

---

[9]Performance Appraisal for Kim Ralston dated May 1, 2007, Exh. 29, hereto.

[10]Ralston dep. 9:11-16.

[11]Ralston Dep.13:12-15:7; 16:12-17:4.

29 hereto. Moreover, when Evans was demoted from supervisor to work in the Quality Control Department, among the stated reasons was that Evans had "insufficient control and accountability of production documents, resulting in rework and Phase Closure delays." Memo from Hartwell Wilson to Evans' annual Performance Appraisal dated September 20, 2001, attached hereto as Exh. 29. These processes in which Evans was deficient were the very processes that Ralston had to train him on once he returned to the Production Control department.

Defendant argues that Ralston had never worked on a helicopter whereas Evans had, but this ignores that the job both Evans and White held, the position of Production Control Foreman was not a job that required working on the helicopters. It was a job that involved handling the paperwork required to document and control the work flow refurbishing the helicopters. It is not that Ralston is being compared to someone who, at the time actually worked on helicopters themselves while she did not. Ralston's 6-year's experience in Production Control, during which time,she excelled at her job and mastered it to the extent that she trained her own supervisor, demonstrates that Defendant's arguments look only at the surface of Ralston's, Evans' and White's experience. An more accurate assessment of what they actually did in the position they shared shows that Evans and White are the proper comparison for Ralston's pay discrimination and pay disparity claims under Title VII and the EPA because they held a comparable position as she did yet were paid more.

### 4.    US Helicopter intentionally paid Ralston less than both Evans and White because of her gender.

When Ed Cordes selected Ralston for the position of Production Control Foreman, he told her that she would be paid $48,000/yr, but that Hartwell ("Willy") Wilson, the General Manager,

would have the final say about her salary.[12]/[13] Ralston protested to Cordes and complained that she

felt that Wilson discriminates against women in the workplace.[14]   Cordes replied that he strongly

felt that she was well worth $48,000/yr.[15]

When Kim Ralston, U.S. Helicopter's HR Manager, officially offered Ralston the position,

Durden told Ralston that her salary would be $40,500/yr.[16]  Ralston told Durden that this is not the

salary that she was quoted, but Durden told her that Wilson had a man in mind for the position, so

Ralston could take the position for $40,500/yr that day because Durden had to post that the position

had been filled.[17]  Ralston accept the position at that salary and stated to Durden that she was taking

it because she did not want to be discriminated against for being a woman, and she was going to do

the job.[18]  Ralston asked Durden to investigate why she was not being paid $48,00/yr.[19]  Durden

agreed to do this, but Ralston heard nothing further from Durden about it.[20]

---

[12]Ralston Dep. 47:16-48:17; Cordes Dep. 29:20-30:1.

[13]Willy Wilson's testimony in this case raises credibility issues because defendant relies upon his testimony in this case while at the same time suing him in *Bell Aerospace Services, Inc., v. U.S. Aero Services, Inc.,* Case No. 1:09cv141-MHT in the United States District Court for the Middle District of Alabama ("*Bell*") for fraud and theft of intellectual property, among other claims.

[14]Ralston Dep. 47:16-48:17.

[15]*Id.*

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]Ralston Decl. ¶ 127.

[20]Ralston Decl. ¶ 129.

On August 1, 2007, Ralston spoke with Lou Ann Falkenstein, Durden's boss and the Director of Numan Resources and Administration, about the discriminatory pay difference who said she would look into it.[21] Ralston talked to Falkenstein again in September of 2007, and Falkenstein said she was still looking into it.[22] Falkenstein understood that her conversations with Ralston could be a triggering point for an accusation of retaliation if something adverse was done to Ralston as part of the response.[23]

Durden told Falkenstein that they had told Ralston that her salary would be reviewed in six months after she had been promoted to foreman.[24] On or about January 7, 2008, Duren called Ralston into her office and told Ralston that they had looked at the pay and because Ralston had been in the position for six months that they were raising her pay to $46,342.40 as of December 2, 2007.[25] When Ralston questioned why her back pay did not go back to when she was promoted to foreman in June of 2007, Durden told her that she had been told that she would be evaluated in six months, but this was the first time that Ralston had been told about a six-month evaluation.[26] Ralston continued to complain that she was still being given discriminatory pay, but Durden told her to accept what she got.[27] Keith West, the Operations Manger of Production Control, told White that

---

[21]Durden Dep. 184:20-185:6; Falkenstein Dep. 9:23-10:2; 46:6-13; 116:2-8.

[22]Ralson Decl.

[23]Falkenstein Dep. 54:5-14.

[24]Falkenstein Dep. 116:11-22.

[25]Durden Dep. 187:10-16;

[26]Ralston Decl. ¶¶ 131 and 132.

[27]Ralston Decl. ¶ 132.

she had just received a huge raise because of the investigation over her starting salary and that, therefore she was not going to be given the percentage increase he gave to everyone else.  Thus, Ralston continued to feel the effects of the discriminatory pay she received when annual increases were given out and Ralston's raise was 3.5% whereas Ed White's annual raise was 5%.[28]

The circumstances surrounding setting Ralston's pay clearly were done on the basis of her sex.  Ralston complained that her salary was less than comparable male employees who held or did hold her position, the company investigated her complaint and then raised her salary but it still was not equal to what Evans and White made.  Defendant's "reason" that her salary was raised after a six-month review was clearly invented so as to disguise the fact that Ralston's salary was depressed as compared to Evans and White.  Defendant has brought forward no document that shows that Ralston was informed about a six-month review whereas Ralston testifies that the first she heard about it was when she was told that she would get back pay for one-month and her salary would be raised.  The bogus quality of Defendant's reason for giving her a raise shows pretext.  Additionally, as explained, Willy Wilson's credibility has been compromised by the fact that he is being sued for fraud and theft by the very company that is now relying on his testimony in this case.  It was Wilson who set Ralston's salary so low in the first place even when Ralston complained that she believed he was prejudiced against women in the workplace.  The Supreme Court has held in *Hicks* that "[t]he factfinder's disbelieve of the reasons put forward by the defendant **(particularly if disbelief is accompanied by a suspicion of mendacity)**, may together with the elements of the prima facie case, suffice to show intentional discrimination."  *Hicks, supra*, at 511 (emphasis added).   Given the

---

[28]Payroll Change Record for Kim Ralston showing 3.5% raise and Payroll Change Record for Ed White showing 5% raise, Exh. 14, hereto.

lawsuit against Wilson and his compromised testimony in this case, certainly a "suspicion of mendacity" has arisen which is sufficient, together with Ralston's prima facie case to show intentional discrimination. For these reasons, Ralston's Title VII claim of sex discrimination in pay is due to survive summary judgment.

### 5.   US Helicopter's "factor other than sex" argument for paying Ralston less than both Evans and White is not credible.

To prevail on her EPA claim of unequal pay for equal work, Ralston does not have to show intentional discrimination, as with her Title VII claim for sex discrimination in pay, as argued above. Rather, she simply has to show that the defendant's argument that a "factor other than sex" was the reason for the pay disparity. *Meeks, supra*, at 1019. "[T]he 'factor other than sex' exception applies when the disparity results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business." *Glenn v. General Motors Corporation*, 841 F.2d 1567, 1571 (11th Cir. 1988). Defendant has shown none of these factors. As argued, despite Defendant's argument that White and Ralston has "unique characteristics of the same job," Ralston has shown that both she and White supervised three employees in the Production Control department and both were responsible for managing documents related to the work flow in refurbishing the helicopters. Furthermore, Ralston knew how to do White's job. White gathered from the production managers' information about how many hours it would take to complete various phases of the projects, and Ralston took that information and produced the work orders and gathered information about how much time it had actually taken to do the work.[29] Ralston actually trained Evans to do the Production Control foreman job that she was

---

[29]Ralston Decl. ¶ 124.

doing, so there could be no difference in any "unique characteristics of the job" as between Ralston and Evans.

Ralston has also shown that the pay disparity did not result from "an individual's experience, training, or ability." Defendant has only skimmed the surface of Ralston's experience, training and ability, as compared to Evans and White. Obviously, if Ralston was required to train Evans to do the job that they both held at different times, as she was required to do, any differences in their experience, training and ability were not relevant to the position as to them. Further, any differences in experience, training and ability as between Ralston and White were irrelevant as to the position they both held since Ralston's six-years of experience in the Production Control department before she became foreman had made her equally proficient if not more proficient at her job than White as evidenced by multiple statements of Ralston's excellence at her work.[30] There certainly was no difference in ability among the three of them, except that Ralston's training of Evans speaks to her perhaps superior ability. Any differences in experience and training became irrelevant since any specific training held by Evans and White did not result in any difference in job assignments or Ralston's ability to do the job that she, Evans and White shared. For these reasons, defendant's "factors other than sex" argument fails and Ralston is entitled to survive summary judgment on her EPA claim.

## B.   DISPARATE TREATMENT IN TERMS AND CONDITIONS OF EMPLOYMENT/HOSTILE WORK ENVIRONMENT

The 11th Circuit in *Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798 (11th Cir. 2010)

---

[30]Performance Appraisal from George Evans dated may 1, 2007, Exh. 29, hereto; Record of Counseling dated August 8, 2006, Exh. 21, hereto ([I]t's never been acout the caliber of your work.").

has recently explained a Title VII disparate treatment case as follows:

> Title VII of the Civil Rights Act prohibits employers from discriminating in the workplace on the basis of an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The statue and accompanying case law organize discrimination into two categories. In disparate treatment, an employer discriminates against a work "with respect to his compensation, terms, conditions, or privileges of employment, because of" the individual's membership in a protected category. *Id.* § 2000e2(a)(1). Disparate treatment can take the form either of a "tangible employment action," such as a firing or demotion, or of a "hostile work environment" that changes 'the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned."

*Reeves*, 594 F. 3d at 807. As in *Reeves*, the issues in this case are "whether the conduct alleged to have pervaded [U.S. Helicopter] created a hostile work environment that 'exposed [Ralston] to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed.' (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 812 (1998)).[31]

In the 11th Circuit, the harassment does not have to actually be sexual in nature to be considered unlawful sexual harassment. "Conduct of a nonsexual nature which, for example, ridicules women or treats them as inferior, can constitute prohibited sexual harassment." *Sims v. Montgomery County Commission*, 766 F.Supp. 1052, 1073 (M.D. Ala. 1990) (J. Thompson); *see also Tipp v. AmSouth Bank*, 76 F. Supp. 2d 1315, 1332 (S.A. Ala. 1998) (harassment was based on gender for summary judgment purposes where the plaintiff testified that the harasser yelled and cursed at her and at other women, but not at men); *Equal Employment Opportunity Commission v. Union Camp corporation*, 7 F. Supp. 2d 1362, 1373-75 (S.D. Ga. 1997) (denying defendant's motion for summary judgment on the issue of "based on sex" where the harassment of the only female fire

---

[31]Ralston Decl. ¶¶ 1,2,3,7,11,12,16,17,40, 41, 42, 43, 87; *see* Sections II.D. and E., above.

fighter in the station consisted of nonsexual pranks and teasing such as hindering her access to the showers, locking her out of the facility, and "pick[ing] at" her or ignoring her; as well as assigning her undesirable or faulty equipment and assigning her undesirable tasks: "Courts have long made clear . . . that where a work environment is dominated by members of one gender and the workplace environment is hostile to the other gender by treating that other gender as inferior, Title VII affords protection."). The 11th Circuit recognized in *Bell v. Crackin Good Bakers, Inc.*, that threatening behavior can also constitute sexual harassment, as long as it is linked to the plaintiff's sex. 7777F.2d 1497, 1503 (11th Cir. 1985).

According to the Supreme Court,

In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. To assess whether a court may, for the purpose of determining liability, review all such conduct, including those acts that occur outside the filing period, we again look to the statute. It provides that a charge must be filed within 180 or 300 days after the alleged unlawful employment practice occurred. A hostile work environment claim is composed of a series of separate acts that collectively constitutes one unlawful employment practice. The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002) (internal citations, quotations, and footnote omitted).

Ralston brings her disparate treatment/hostile work environment claim based on the following actions:

1. **Being disciplined after complaining about discriminatory behavior by male employees.**

Ralston experienced a pattern during her employment at U.S. Helicopter in which she would be disciplined after she complained about the discriminatory behavior of the male employees, or disciplined for otherwise unfounded reasons, culminating in her termination. Because Ralston's termination, first on March 28, 2008 and then again on June 5, 2008 after being put on administrative leave during the interim ,was part of this pattern, she is entitled under *Morgan* to reach back beyond the statute of limitations to include all the incidents of this pattern that "collectively constitute[] one unlawful employment practice." *Morgan, supra*, at 116-117.

a. **July 23, 2003 Letter of Warning and February 25, 2004 Letter of Suspension**

This pattern was well established by 2003, when Ralston was given a Letter of Warning on July 23, 2003.[32] In response, Ralston wrote the comment: "I told George Evans about Larry saying G.D. and also debbie language [sic] but nothing has been done."[33] Almost a year later, Ralston wrote a memo to Geroge Evans describing an incident on February 23, 2004, involving Larry Anderson and his behavior toward her, including his loud "ugly" talk.[34] The response Ralston got was to be called into a meeting and given a counseling by Keith West and Kim Durden.[35] During the meeting Ralston complained that she was being discriminated against because she was a woman and was

---

[32]Doc. 26-10.

[33]*Id.*; Ralston Decl. ¶ 8.

[34]Handwritten memo "To Whom It May Concern", Exh. 18, hereto; Ralston Decl. ¶ 9.

[35]Letter of Suspension dated February 25, 2004, Exh. 23, hereto.; Ralston Decl. ¶ 10.

being subjected to a hostile environment because of her gender.[36]  She explained, as she had in July

of 2003, that Anderson cursed her and threw things at the computer when she talked to him.[37]  She

also explained that other men, such as Marvin Horn, treated her with disrespect and cursed her using

"G.D. (God Damn)" which concerned her greatly.[38]  No investigation of Anderson or Horne's

behavior was done to her knowledge, and no documents have been provided in this lawsuit to

indicate that any discipline was given to Anderson or Horne.[39]

     Kim Durden's Memorandum to the File regarding this incident also indicates how the tables

got turned on Ralston whenever she complained.[40]  Durden writes that at the counseling meeting of

February 25, 2004, Ralston became "defensive and argumentative"[41] which Ralston denies.[42]  Yet,

Durden also writes that Ralston "feels that she is being counseled because she is a woman and that

she is working in a hostile environment."[43]  Regardless of what Durden may have thought about

Ralston's tone, Ralston's complaint about being disciplined because she is a woman and working

in a hostile environment is protected speech under Title VII.  42 U.S.C. § 20003-3(a).  No

investigation of Ralston's complaint was made even though she had made the complaint about

---

[26]Ralston Decl. ¶ 10.

[37]*Id.*

[38]Ralston Decl. ¶ 11.

[39]*Id.*

[40]Memorandum of Record by Kim Durden dated February 25, 2004, Exh.19, hereto.

[41]*Id.*

[42]Ralston Decl. ¶ 15.

[43]Memorandum of Record by Kim Durden dated February 25, 204, Exh.19, hereto.

Anderson before.

### b.     Pre-July 2003 Complaints and Disciplines

Ralston's first complaint regarding her hostile work environment occurred on February 21, 2003, which was recorded by Dick Joyce, one of the company's then-owners, in a Memo to the Record regarding a notebook of incidents of harassment that Joyce had heard Ralston was keeping.[44] Joyce noted that Ralston was keeping a notebook "noting incidents of [her] being the victim of harassment by [her] direct supervisor and other employees."[45] Ralston's direct supervisor at the time was George Evans. In the memorandum, a handwritten notation states, "Yes, Sometimes!" to the question, "Do you feel that you have been a victim of harassment?"[46] Joyce notes that Ralston had told him that she had complained to H.R. and her manager but "it hadn't gotten better."[47] What Joyce records is express and direct complaints by Ralston about particular men she works with and their behavior toward her, yet Joyce records nothing about any further investigation or questioning by him or by anybody about Ralston's complaints. Joyce only records that "I told her that I was satisfied as long as staff responded to her and that she had no legal issues."[48] Joyce's response was inadequate and insufficient as a matter of law. She was telling him that she had complained to H.R. and her manager, but nothing had changed, not that they had been "responsive," whatever that may mean. Defendant is liable where it fails to take prompt remedial action and is relieved of such

---

[44]Memo to the Record of Dick Joyce dated Febraury 21, 2003, Exh.17, hereto.

[45]Id.

[46]Id.

[47]Id.

[48]Id.

38

liability for co-employees' harassment "only if such action 'is reasonably calculated to prevent further harassment.'" *Lewis v. U.S.Department of Labor*, 2010 WL 638564 (11th Cir. Feb. 24, 2010)(citing *Knabe v. Boury Corp.*, 114 F.3d 407, 412 n. 8 (3d Cir. 1997). Furthermore, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002). When Joyce failed to take prompt remedial action that would be efficacious and prevent reoccurrence of the incidents that Ralston was complaining about regarding harassment by co-workers and his supervisor, he set the stage for actionable an actionable Title VII disparate treatment claim despite his instruction that Ralston should, in essence, inform him if she had any "legal issues" which is precisely what she was doing.

Further, what Joyce meant by telling her that he was satisfied as long as she had no legal issues is a mixed message at best. There is no indication that either Joyce or Ralston were trained to know what the law requires employers to do in order to keep their workplaces free from sex/gender discrimination so as to prevent a hostile work environment. Defendant has offered no evidence of any such training of its managers or supervisors. Hohbach testified that he had no training in how to terminate anyone or in other aspects of employment discrimination. Hohbach Dep. 128:9-20.

In fact, Joyce's failure to take remedial action is evidenced just two months later when George Evans wrote a memo for the Record dated April 2, 2003, in which he instructs Ralston to "let it go for now" in regard to a dispute Ralston had with Larry Anderson in which Anderson used

abusive language.[49]

   **c.**  **August 6, 2006 Record of Counseling**

   On August 2, 2006, Ralston wrote an e-mail to Kim Durden complaining about Kevin Brion's use of foul language, including saying that he couldn't get a "fuckin' thing done over here."[50] Ralston asks Durden to address the language issue because she was getting no response from her supervisor, George Evans on the issue.[51] When Ralston had complained to Evans about Brion's multiple uses of the word "fuck" when he was asking her to help him get some paperwork, Evans told her that she just needed to let it go because that was just the way men were.[52] When she told him she wanted something done, he against said their workplace was a "male environment" and that was the way it is going to be.[53]

   When Ralston wrote to Durden asking for help, Durden never asked Ralston for any details or investigated her complaint.[54] Instead, Durden was written up on August 8, 2006, by George Evans for allegedly losing her temper in response to Kevin Brion's "uncontrolled outburst of words (profanity)" to which Ralston wrote a statement in response.[55] In other words, after Ralston gets no response from Evans about Anderson's brutal language, gets no response from Durden about

---

[49]Memo for Record dated April 2, 2003, Exh.22, hereto.

[50]E-mail from Kimberly Ralston to Kim Durden dated August 2, 2006, Exh. 20, hereto.

[51]*Id.*

[52]Ralston Decl. ¶ 86.

[53]Ralston Decl. ¶ 87.

[54]Ralston Decl. ¶ ¶ 81 and 89.

[55]Record of Counseling dated August 8, 2006 and Ralston's statement in response, Exh.21, hereto.

Anderson's brutal language, the response was to write her up for allegedly "losing her temper" when reporting Anderson's profanity.

Furthermore, Kim Durden wrote a Memorandum of Record on August 9, 2006, in which she interprets Ralston's e-mail to say that Brion did not direct his profanity to her but was said in her presence as he was leaving the work area.[56] Such a distinction has no weight in the law. The 11th Circuit has clarified in *Reeves v. C.H. Robinson Worldwide, Inc.,*I 525 F.3d 1129, 1144-1145 (11th Cir. 2008) that the "based on sex" requirement of a plaintiff's title VII hostile work environment sexual harassment claim against an employer is satisfied even where the coworkers did not direct the language directly at employee. Neither does the conduct have to be sexual in nature. *Sims, supra,* at 1073. Conduct of a nonsexual nature which ridicules women or treats them as inferior can constitute prohibited sexual harassment. *Id.* Ralston states that the abusive language to which she was subject was directed at her, as a woman, as the only woman foreman, by her male co-workers and was not direct by these men at other men. Ralston Decl. ¶ ¶ 1 and 2.

### d.    May 15, 2006 Letter of Suspension.

No doubt the most confounding an bizarre that Ralston received was a Letter of Suspension on May 15, 2006.[57] Ralston was cailed into the office of Wiily Wilson, General Manager of US Helicopter on May 15, 2006 and presented with a Letter of Suspension. Even though the employees had been told that their disciplinary records would be wiped clean in June of 2005 when Bell bought U.S. Helicopter, the May 15 letter listed every write-up Ralston had since 2001.[58] The letter

---

[56]Memorandum of Record by Kim Durden dated August 8, 2006, Exh.21, hereto.

[57]Letter of Suspension dated May 15, 2006 (Doc. 26-9).

[58]Ralston Decl. ¶ ¶ 38 and 39.

41

contained a list of so-called defamatory "statements" Ralston had made about "other employees and members of management."[59] Ralston was shocked by the letter and the way it was presented to her.[60]

As Ralston chronicles in her Declaration, some of the alleged statements had been made or contained kernels of statements which had been made but not made by her and most had been made by men in her presence of Evans had made statements to had asked Ralston for information which was then listed in her suspension letter as coming from her and as being derogatory.[61]  There is no repeat here every statement attributed to Ralston and Ralston's response to these absurd accusation in the meeting since Ralston gives the details of every statement and its proper context in her Declaration.[62]  Needless to say, Ralston was not given a chance to give her "side" before she was written up, but rather was simply called into the meeting and presented the litany of supposedly derogatory statements made by her.[63]  After thoroughly explaining each one and having Kim Durden even confirm my statement about Terri Griffin sending her an e-mail about how offended she was by George Evans' body odor, the suspension was still carried out.[64]

### 2.   Being subject to abusive language and behavior from male employees who did not subject other male employees to this behavior.

Some of the instances where Ralston was subject to the abusive language of her male co-

---

[59]Doc. 26-9; Ralston Decl. ¶ 41.

[60]Ralston Decl. ¶ 40.

[61]Ralston Decl. ¶ ¶ 42, 43, 44.

[62]Ralston Decl. ¶ ¶ 45, 46, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79.

[63]Ralston Decl. ¶ ¶ 46, 47, 48.

[64]Ralston Decl. ¶ 80.

employees which then, upon her complaints, became the grounds for disciplining her have been discussed above, yet Ralston reports that she was subject to this atmosphere in which she was cursed at by men on almost a weekly basis.[65]   When Ralston complained to Evans, her supervisor, that because most of the individuals and all of the supervisors with whom Ralston interacted were retired military that the treatment she was complaining about was simply the way men treated women in the military.[66] Ralston was routinely treated by the men, both supervisors and co-employees at Bell with condescension and disrespect.[67]   Such actions contribute to and constitute the "one unlawful employment practice" to which Ralston was subjected. *Morgan, supra*, at 116-117.

### 3.   Not allowed to attend meetings that other foreman attended

Not only was Ralston subject to continual harassment by her male co-workers, but she was also denied the privileges and responsibilities of her position as a foreman in the Production Control department.  Brent Hohbach told her not to attend any further production meetings that he held first thing in the morning when the people who routinely attended were the production foremen, production supervisors and quality foremen.[68]   Ralston was the only female foreman, and the only female at Hohbach's meetings during the short time that she attended them. When Ralston complained to Evans that Hohbach told her not to attend the morning production meeting, Evans told her to get the chip off her shoulder about sex discrimination.[69]

---

[65]Ralston Decl. ¶ 17.

[66]Ralston Decl. ¶ 16.

[67]Ralston Decl. ¶ 17.

[68]Hohbach 52:1-8; Ralston Decl. ¶ 98.

[69]Ralston Decl. ¶ 99.

43

Case 1:09-cv-00379-MHT-WC   Document 41   Filed 04/12/10   Page 48 of 54


## C.    DISPARATE TREATMENT/TERMINATION

In evaluating a Title VII disparate treatment claim supported by circumstantial evidence, as here, we use the *McDonnell-Douglas* burden-shifting framework. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004). Under this framework, the plaintiff may establish a *prima facie* case of disparate treatment by "showing that [he] was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Id.* If a *prima facie* case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* Once the employer satisfies its burden, the burden shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination. *Id.*

Ralston satisfies her prima facie case because she is a female and was subject to the adverse employment action of termination. As the only female foreman at US Helicopter who was terminated for supposed insubordination by not completing a work assignment given to her by her supervisor, George Evans. Ralston makes her prima facie case by comparing the circumstances of her termination to the same circumstances of her supervisor, George Evans, who was, in fact, given the instruction to complete the process under question and he, himself, was insubordinate in not completing the task that was given to him by his superior, Brent Hohbach. But Evans was not terminated for failing to write the process that he was instructed to write. In fact, he not even disciplined. Further, the process was not completed for about 10 months, long after Ralston was terminated for not writing it. Ward Dep. 35:8-21; 37:1-23.

The employer's proffered reason for terminating Ralston was not worthy of belief. Even the decision-maker said that the process she was supposedly insubordinate in not completing did not

know, himself, if it was completed at all or if she ever completed it. Ward Dep. 34:15-14; Evans 104:22-105:3. Furthermore, Hohbach, who terminated Ralston, states that he based his termination of her on a document dated May 6th in 2006 that talked about insubordination. Hohbach Dep. 137:19-23. There is no such document. But in the letter of termination, Hohbach says that he based her termination on a May 2006 letter indicating that she had been insubordinate. *See* March 2008 termination letter. Hohbach must have been referring to the May 15, 2006 Letter of Suspension, but that suspension letter was not about insubordination. The May 15, 2006 letter was the list of supposedly derogatory statements made by Ralston. *See* May 15, 2006 Letter of Suspension. This confusion of motives and mis-articulate and contradictory reasons for Ralston's termination creates a strong inference of pretext.

Furthermore, the Supreme Court in *Hicks* held that "[t]he factfinder's disbelieve of the reasons put forward by the defendant **(particularly if disbelief is accompanied by a suspicion of mendacity)**, may together with the elements of the prima facie case, suffice to show intentional discrimination." *Hicks, supra*, at 511 (emphasis added). Reason to disbelief Hohbach have discussed at length in this brief. His compromised credibility also contributed to the pretextual nature of her termination. Another reason to believe this is pretext is that Brent Hohbach claims he made the decision to termination Ralston without ever speaking to or getting input from Evans. This indicates that Hohbach was operating out of his manifest distrust and animus toward women since he did not even investigate thoroughly whether Ralston should be terminated or give her a chance to tell her side of any reasons he might propose. Rather, he sought advice from West and Durden (Hohbach's sexual friend) who had only days before been accused by Ralston of discriminatory pay and she had been somewhat, though no wholly compensated for the pay disparity under the guise of

a 6-month review that she did not even know about.

Moreover, Ralston brings direct evidence of discrimination because of seeing Hohbach stare directly at her during a Production meeting and say that he was going to fire someone soon. Ralston's sense that Hohbach was acting on a discriminatory animus when she over head him say that women should not be in authority positions.

Having made a prima facie case of discrimination and given ample evidence that the preferred reason for her termination was merely a pretext for unlawful discrimination, Ralston's Title VII termination is due to survive summary judgment.

## D.     TITLE VII/EPA RETALIATION

In order to establish a prima facie case of retaliation in violation of Title VII, plaintiff must establish: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  To establish an adverse employer action that will support a claim of unlawful retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Burlington N. & Santa Fe Ry. C. v. Whie*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F. 3d 1211, 1219 (D.C. Cir. 2006) (quoting *Washington v. Ill. Dept. Of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005))).

Retaliation under the EPA are the same as the anti-retaliation provisions of the FLSA. *Equal*

.employment Opportunity Commission, v. White and Son Enterprises, 881 F.2d 1006, 1011(1th Circ. 1989) (finding that unofficial complaints expressed by the women to their employer about unequal pay constitute as assertion of rights protected under the statute). The prima facie case for retaliation under the EPA requires that a plaintiff show "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility , and which are performed under similar working conditions.'" *Id.* at 1009 (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

Ralston was retaliated for complaining about her discriminatory pay, particularly when she complained about the difference between her annual raise of 3.5% and Ed White's annual raise of 5% on February 28, 2008. Ralston complained to Keith West, who participated in her termination a month later on March 28, 2008. West told that she did not get the same annual raise as West because she had just gotten a big raise. This "big raise" was the raise from her original salary of $40,500 when she was promoted to foreman about which she had also complained that it was not equal to her comparable male workers in the Production Control foreman position. She had been given a raise of more than $6000/yr under the pretense that she had completed her 6-month review after her promotion, but the raise was actually in response to her complaints about discriminatory pay. West's reliance on this raise to deny her a comparable annual raise to her male counterpart, Ed White, only compounds the discrimination taken against her on the basis of her pay. Ralston Decl. ¶ 134.

The close proximity between Ralston's complaint about her lesser raise in February of 2008 followed by her termination in March of 2008 in which the same man to whom she complained in February participated in her termination in March when he was consulted by Brent Hohbach about

whether she should be terminated is a clear showing of retaliation in her termination under both Title VII and EPA. The Eleventh Circuit has instructed that it interprets the "causal link requirement" for retaliation broadly and that a showing of a "very close" proximity between the protected activity and the adverse action, such as in this case when the protected activity of complaining about disparate, unequal pay came just one month before Ralston's termination and that the man to whom she complained had a hand in terminating her falls within the 11th Circuit's requirement of a "very close" proximity that establishes a prima facie case of retaliation. *EEOC v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1571 (11th Circ. 1993); *Clark County Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001)("the cases taht accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish prima facie case uniformly hold that the temporal proximity must be 'very close.'") (citations omitted).

## CONCLUSION

For all the foregoing reasons, Ralston is due to survive summary judgment on her Title VII/EPA discriminatory pay claims; her Title VII disparate treatment in terms and conditions/hostile environment claims as weli as her Title VII termination claim and her Title VII/EPA retaliation claims.

Respectfully submitted this 12th day of April, 2010.

/s/ Ann C. Robertson
Ann C. Robertson
Susan Donahue
Counsel for Plaintiff

48

OF COUNSEL:
WIGGINS, CHILDS, QUINN & PANTAZIS, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

CO-COUNSEL:

Bobbie S. Crook
367 S. St. Andrews Street
Dothan, Alabama 36301
(334) 671-8062

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2010, a true and correct copy of the foregoing was served by electronically filing same with the Court's CM/ECF electronic filing system which will serve copies upon the following:

Martha Leach Thompson, Esq.
H. Cannon Lawley
David M. Fleming
Huie, Fernambucq & Stewart, LLP
Protective Center Building 3
2801 Highway 280 South, Suite 200
Birmingham, Alabama 35223


/s/ Ann C. Robertson
OF COUNSEL

50