IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| KIM RALSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:09cv379-MHT |
| | ) | (WO) |
| | ) | |
| BELL AEROSPACE | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

Plaintiff Kim Ralston filed this lawsuit claiming
that her former employer, defendant Bell Aerospace
Services, Inc., violated federal law by discriminating
against her because of her gender in violation of Title
VII of the Civil Rights Act of 1964, as amended (42
U.S.C. §§ 1981a, 2000e to 2000e-17), and the Equal Pay
Act of 1963, as amended (29 U.S.C. § 206(d)).
Jurisdiction over Ralston's claims is proper under 28
U.S.C. § 1331 (federal question), § 1343 (civil rights);

42 U.S.C. § 2000e-5(f)(3) (Title VII); and 29 U.S.C. § 216(b) (Equal Pay Act).

This case is currently before the court on Bell Aerospace's motion for summary judgment. Summary judgment will be granted in part and denied in part.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In deciding whether summary judgment should be granted, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Bell Aerospace is in the business of providing helicopter maintenance support to both government and non-government agencies. Ralston began working for the company in May 2001 as a production-control processor at its Ozark, Alabama facility.[1] She asserts that, from the beginning, her time at Bell Aerospace was plagued by gender discrimination. Her allegations may be separated into three distinct categories: (1) she was subjected to a "hostile-work environment" because of her gender; (2) she was terminated because of her gender or in retaliation for alleging gender discrimination; and (3) she was not paid the same as her male counterparts following her promotion to production-control foreman.[2]

_____

1. Because Bell Aerospace purchased U.S. Helicopter in 2005 and hired its employees, pre-2005 references to Bell Aerospace in this opinion are to U.S. Helicopter as well.

2. At the pretrial conference, Ralston's counsel stated that she was also bringing a Title VII "promotion" claim against Bell Aerospace. This claim does not appear in the complaint or in Ralston's response to Bell (continued...)

3

<u>Hostile-work environment</u>: Ralston recounts several instances of hostile treatment from her co-workers during her tenure at the company; many of these instances coincided with her being disciplined by her superiors. She maintains that she was treated differently from the manner in which her male peers were treated.

Ralston's complaints began in 2003, when she informed the owner of Bell Aerospace that she felt that, at times, she was a victim of harassment.   There is no further indication in the record as to her specific allegations. The owner's hand-written notes state that "there had been no instances of sexual harassment," but that Ralston complained about her supervisor's management style. Pl.'s Ex. 17.

Ralston next complained of harassment in February 2004.   After engaging in an argument with one of her co-workers regarding his hostile attitude and use of vulgar

---

2. (...continued)
Aerospace's motion for summary judgment.   Therefore, the court does not address this charge.

language, she was suspended for three workdays because the argument "exceed[ed] the authority of [her] position." Pl.'s Ex. 23.  In response to her suspension, she met with Human Resources Representative Kim Durden and Operations Director Keith West and "complained that [she] was being discriminated against because [she] was a woman and was being subjected to a hostile environment because of [her] gender."  Pl.'s Ex. 16 at 4.

A month following her suspension, Ralston was disciplined for failing to follow the instruction of her immediate supervisor, Production Control Foreman George Evans.  Upon receiving the letter, she responded, "I feel that G. Evans picks on me. ... I feel very unliked around this facility."  Def.'s Ex. J.

For the next two years, the record is barren of any evidence of a hostile-work environment.  Then in May 2006, following her annual review by Operations Vice President Willy Wilson, Ralston was again suspended for three workdays.  Wilson explained that he suspended her

because she made defamatory statements against her
coworkers and because she "seems to have a problem
staying focused on her job at hand and feels she needs to
be involved in areas of the company that do not concern
her and exceeds the authority of her position."  Def.'s
Ex. F.  In a written statement, Ralston responded that:
"Evans is [a] very unfair supervisor. ... I feel like I
will never get a fair appraisal from George Evans no
matter how hard I try[,] he always puts me down!"  Def.'s
Ex. M.  Ralston argues that she did not make any of the
defamatory statements for which she was suspended.

After the May 2006 suspension, Ralston again
complained about vulgarity in the workplace; Foreman
Evans wrote a letter to her explaining that it was
inappropriate for her to lose her temper over the use of
vulgar words, stating, "while I understood the anger and
frustration that you felt, your conduct [will] no longer
be tolerated."  Pl.'s Ex. 21.  Ralston contends that
Evans told her that she had to let the vulgarity go

"because that was just the way men were" and that "this is a male environment and that is the way it's going to be."  Pl.'s Ex. 16 at 13.

Despite the suspensions and letters of warning, Ralston was promoted to production-control foreman in June 2007, after Foreman Evans was promoted to night-shift supervisor.  She became the only female foreman at the time of her promotion; she supervised three other employees working in the production-control hub.  In January 2008, she received a significant raise in her salary and, one month later, received another 3.5 % raise.

Soon after Ralston received her January raise, Brent Hohbach was promoted to production-control manager and began supervising the daily production meeting that occurred each morning.  The purpose of these meetings, attended daily by production foremen, supervisors, and quality foreman, "was to allow people to exchange ideas and find out where everybody was in the production

process so that they could work together and be
knowledgeable about how production could be done." Pl.'s
Resp. Mot. Summ. J. at 13. Ralston was the only female
who attended these meetings. Just before one such
meeting, she overhead Production Manager Hohbach tell the
other foreman present, "Women don't need to be in
authority positions." Def.'s Ex. T at 3.

At one of the first meetings led by Hohbach after he
was named supervisor, he stated, "Someone is going to get
fired by me," and then made eye contact with Ralston.
Pl.'s Resp. Mot. Summ. J. at 18. After this meeting,
Hohbach banned Ralston from the production meetings,
informing her that, because Evans, her direct supervisor,
was present each morning, she should no longer attend.
Hohbach insisted in his deposition that he thought
Ralston "had lots of work in the hub" that required her
presence. Def.'s Ex. R at 55. Ralston complained to
both Human Resources Director Lou Ann Falkenstein and
Human Resource Representative Durden as well as Evans,

8

about Hohbach's decision to bar her from the morning meetings.    After banning Ralston from production meetings, Hohbach counseled her for insubordination.

In early March 2008, Evans ordered Ralston to complete a project assigned at the morning production meeting.  Because Ralston had not been in attendance, she asked Evans why she was assigned the project; she then proceeded to question Production Manager Hohbach. Hohbach issued her a record of counseling, as he believed that she should not have questioned the assignment. Hohbach did not have Ralston sign the counseling form or respond in writing.  See Def.'s Ex. N.  On that same day, Hohbach ordered her to dock time from her salary when she had to leave work early, even though she was a salaried employee.    Ralston complained to Human Resources Representative Durden, who told her, "that's the way Brent does it."  Def.'s Ex. T at 2.[3]

---

3. As other evidence of a hostile-work environment, Ralston contends that, while the male foremen were allowed to wear jeans to work, she was required to dress
(continued...)

Termination and retaliation: Three weeks after he counseled her for insubordination, Production Manager Hohbach fired Ralston for insubordination after she again challenged Supervisor Evans as to who would write a project Hohbach had initially assigned to Evans. Hohbach made the decision himself and later informed Operations Director West of his intentions. Evans states that Ralston questioned why she was not included in a meeting to discuss the project assigned, and he contends that Ralston said "she wasn't going to write 'nothing' cause she wasn't included in the meeting." Pl.'s Ex. 25. It was charged that Ralston challenged Evans in front of other employees in the production-control hub and refused to complete the assignment. Her termination letter, signed by West and Hohbach, states that she had been suspended and counseled in the past for insubordination and that she was informed that any further refusal to

---

3. (...continued)
in more formal attire.

complete assignments or any further confrontations with employees would result in termination.

Ralston submitted a statement in response to her termination, maintaining that Evans and Hohbach discriminated against her and that she felt threatened by Hohbach.  She further said that she was not insubordinate as the project was inappropriately assigned to her and, more to the point, that she did not refuse to complete the assignment.  She insisted that Hohbach had harassed her ever since he received the production-manager position and that she was never counseled that any further acts of alleged insubordination would result in her termination.[4]  Finally, Ralston noted in the statement that she was pressured to complete work assignments that did not comply with government regulations and contracts.

———————————

    4. Hohbach resigned from Bell Aerospace after it was alleged that he had had an inappropriate relationship with Human Resources Representative Durden.  Durden resigned as well and admitted to the inappropriate relationship.

11

After she was fired, Ralston was placed on administrative leave while Bell Aerospace investigated her claims of gender discrimination and her allegation that the company was not fully complying with its government contracts.  On June 5, her termination was made final after Bell Aerospace found no evidence to support her charges.  The company offered her a severance package which would have required her to sign a confidentiality agreement; she refused to sign the document.

Equal pay: As discussed above, in June 2007 Ralston was promoted to the salaried position of production-control foreman.  She was told by her interviewer that the salary would be $ 48,000, pending the approval of management, and that the previous production-control foreman (Evans) was paid over $ 48,000 while serving as a foreman.[5]  When she was offered the job, however, she

_____

5. At the pretrial conference for this case, Bell Aerospace's attorney stated that Evans was paid $ 40,500 as production-control foreman when he started in that (continued...)

12

was informed that Operations Vice President Wilson had decided her starting salary would be $ 40,500.  Ralston complained to Durden and Falkenstein and other Bell Aerospace managers, including West, about the pay discrepancy, contending that she was being paid less because of her gender.  Both Durden and Falkenstein told Ralston that they would look into her complaint.  She was informed in the letter offering her the foreman position that she would be reviewed in January of the next year along with the other salaried workers.

On January 7, 2008, Ralston received a raise to $ 46,342.40, and on February 29 she received an additional raise of 3.5%, making her salary $ 48,925. The other foreman in Ralston's division, Ed White,

---

5. (...continued)
position in 2002.  According to the evidence before the court, in September 2002, when Evans was promoted to production-control foreman, his salary was changed to $ 17.42 an hour.  See Def.'s Ex. DD.

13

received a raise of 5.0 % on the same date, raising his annual salary to $ 55,650.[6]

Ralston filed a complaint with the Equal Employment Opportunity Commission in June 2008.

## III. DISCUSSION

### A. Hostile-Work Environment

To establish a hostile-work-environment claim, Ralston must show that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment. See Walton v. Johnson & Johnson Services, Inc., 347 F.3d 1272, 1279-80 (11th Cir. 2003). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Furthermore, it "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive,

---

6. In June 2007, White's salary had been raised from $ 48,925 to $ 53,000.

14

and one that the victim in fact did perceive to be so." Id. at 787.

As this court recently discussed in Edwards v. Hyundai Motor Mfg. Alabama, LLC, 603 F. Supp. 2d 1336, 1348 (M.D. Ala. 2009) (Thompson, J.), the factors to consider in determining the objective severity of the harassment include: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002). Although there is no "magic number" of insults to give rise to a viable claim, "repeated incidents of verbal harassment that continue despite the employee's objections are indicative of a hostile work environment." Id. at 1276 (quotation omitted).

After examining the totality of circumstances alleged by Ralston, the court finds that there is insufficient evidence of a hostile-work environment for this claim to survive summary judgment. While Ralston does present evidence that gives rise to an inference of gender discrimination at Bell Aerospace (including Supervisor Evans's comment about the workplace being "male dominated," Production Manager Hohbach's utterance that "women don't need to be in authority positions," Def.'s Ex. T at 3, and his decision to ban her from production meetings), this evidence, is insufficient under current case law to support the necessary objective conclusion that her workplace, while offensive, was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).

16

Ralston may have been treated poorly by her supervisors and peers, but Title VII does not create a "general civility code for the American workplace," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998), and "verbal discipline by a supervisor, completely devoid of any statements which could possibly be construed as [sexually] offensive" is not the type of conduct that is actionable under a hostile-work-environment claim based on gender, Portera v. State of Ala. Dep't of Fin., 322 F. Supp. 2d 1285, 1290 (M.D. Ala. 2004) (Thompson, J.) (finding that four non-severe incidents over a six-month period did not create a hostile-work environment). Evidence that co-workers cursed and yelled at her does not show a hostile-work environment actionable under Title VII without evidence that the workers' actions were motivated by gender animus.

Taking into account the factors discussed in Miller, the court must conclude that the evidence is insufficient

to show conduct so severe or pervasive to alter the terms and conditions of Ralston's employment.  <u>See</u> <u>Walton</u>, 347 F.3d at 1279-80.  Therefore, summary judgment will be granted in favor of Bell Aerospace and against Ralston on her Title VII hostile-work-environment claim.


## B. Termination

Relying on Title VII, Ralston claims that she was terminated because of her gender.  In the alternative, relying on Title VII and the Equal Pay Act, she claims that she was terminated in retaliation for complaining about her salary.

<u>Title VII -- Disparate treatment</u>:  Ralston attempts to survive summary judgment on this claim by making out a gender-discrimination case under the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under <u>McDonnell Douglas</u>, Ralston must first demonstrate a prima-facie case of gender discrimination.  A prima-facie case requires "evidence

18

adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 (1977). A prima-facie case raises a presumption of illegal discrimination. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). If Ralston completes this step, the burden then shifts to Bell Aerospace to rebut this presumption of gender discrimination by articulating a legitimate, non-discriminatory reason for its employment action. See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). The company meets its burden if its evidence regarding Ralston's termination is legally sufficient to justify a judgment in its favor, see Burdine, 450 U.S. at 253-55 (1981), at which point she must show by a preponderance of the evidence that the reason given by the company was not the real reason for the adverse-employment decision but rather a "pretext for discrimination," id. at 253.

19

Ralston has established a prima-facie case of gender discrimination.   To establish a prima-facie case of discriminatory discharge, she must show the following: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she was discharged despite her qualification; and (4) some additional evidence that would allow an inference of discrimination.  See  Nix  v.  WLCY  Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).  As to the first three elements: Ralston is a woman, and she was subjected to an adverse-employment action when Production Manager Hohbach terminated her employment. She was also qualified to do the job; she had been in the production-control hub at Bell Aerospace for seven years prior to her termination.

The fourth element of the prima-facie Title VII case is usually met by a plaintiff demonstrating that she was replaced by someone who was not a member of her protected class or that a similarly situated employee, who was not

a member of the protected class, engaged in nearly
identical conduct and was not discharged.  See Nix, 738
F.2d at 1185.  While Ralston was temporarily replaced by
a man, her permanent replacement was another woman, and
she does not present any evidence of other employees, who
were not members of the protected class, engaged in
nearly identical conduct without discharge.  However,
this does not mean that Ralston is without a prima-facie
case.

As this court discussed in Herawi v. State of Alabama
Dept. of Forensic Sciences, 311 F. Supp. 2d 1335, 1346-47
(M.D. Ala. 2004) (Thompson, J.), "[d]emonstrating a
prima-facie case is not onerous; it requires only that
the plaintiff establish facts adequate to permit an
inference of discrimination,"  Holifield v. Reno, 115
F.3d 1555, 1562 (11th Cir. 1997), and there are varying
ways to raise the inference of discrimination.  The court
finds that Production Manager Hohbach's comments that
"women don't need to be in authority positions," Def.'s
Ex. T at 3, and his decision to bar Ralston from

21

production meetings are sufficient to create the inference of discrimination. espec1ally since they preceded her termination so briefly. <u>See</u> <u>Alphin v.</u> <u>Sears, Roebuck & Co.</u>, 940 F.2d 1497 (11th Cir. 1991) (holding that the plaintiff met his burden of establishing a prima-facie case of age discrimination by introducing evidence of his supervisor's comment to the effect that the plaintiff was too old); <u>see also</u> <u>Haynes</u> <u>v. W.C. Caye & Co., Inc.</u>, 52 F.3d 928, 931 (11th Cir. 1995) (explaining that remarks that show bias are particularly probative of discrimination when they are made by the person charged with making the employment decision at issue).

As Ralston has established a prima-facie case of gender discrimination, the court turns its attention to whether Bell Aerospace has articulated a legitimate, non-discriminatory reason for her firing. The company asserts that Hohbach fired Ralston because of her disciplinary history and her insubordination. Hohbach wrote in the termination letter, "You have been counseled

22

on numerous occasions and your employment has been suspended twice, for refusal to complete assignments or confrontations with other employees, your 'letter of suspension' in May 2006 notified you that further occurrence would result in discharge." Def.'s Ex. O at 1. As insubordination in conjunction with a prior adverse employment history is a legitimate and non-discriminatory reason for termination, Ralston must demonstrate by a preponderance of the evidence that this rationale was merely a pretext for discrimination. Burdine, 450 U.S. at 253.

Ralston asserts that Hohbach's stated reason is pretextual; she wrote in response to his termination letter that she "felt very threatened by Brent Hohbach," and that he "never gave [her] a chance [and] he discriminated against [her] from the first time he met [her]." Def.'s Ex. O at 2. As circumstantial evidence of Hohbach's discrimatory intent, Ralston points to his actions following his promotion to production manager in

23

early 2008 as well as the circumstances surrounding her dismissal.

At the time of Hohbach's promotion, Ralston had been working at Bell Aerospace for over seven years. Six months before Hohbach became production manager, she was named the only female production foreman at the company. As a foreman, she attended the daily production meeting along with the other production control foreman (Ed White) and their immediate supervisor (Evans).[7] Ralston was the only female who attended these meetings. However, in a little over a month, in March 2008, when Hohbach took over running the production meetings, he banned Ralston from attending, counseled her for insubordination, attempted to dock her pay after she submitted a leave request despite her status as a salaried employee, and terminated her, without consulting

_____

7. She had just received two raises, one in January and one in February as well as a positive review from her direct supervisor (Evans) in May 2007 stating that, "The busier Kim is, the smoother the section runs." Pl.'s Ex. 29 at 3.

her direct supervisor, Evans.[8]   Moreover, before these events took place, Ralston overhead Hohbach tell the other foreman "Women don't need to be in authority positions." Def.'s Ex. T at 3.

Taken together, the court finds that the evidence of Production Manager Hohbach's comments and actions towards Ralston is sufficient for Ralston to meet her burden of demonstrating pretext.   Comments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext.   See Bonham v. Regions Mortgage, Inc., 129 F. Supp. 2d 1315, 1332 (M.D. Ala. 2001) (Thompson, J.) ("[W]hether comments standing alone show pretext depends on whether their substance, context, and timing could permit a finding that the comments are causally related to the adverse employment action at issue."); see also Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1362 (11th

---

8. As discussed above, unlike with her other disciplinary records at Bell Aerospace, the record of counseling is not signed by Ralston and there is no record of her version of events.

Cir.1999).   Hohbach's comments and actions in the brief time he served as production manager over Ralston are sufficient to suggest that he wanted Ralston out of her position as the production control foreman because she was a woman.   Ralston's most similarly situated peer at Bell Aerospace, the other production-control foreman, Ed White, was treated more favorably.   See Maynard v. Board of Regents of Div. Of Universities of Florida Dept. of Educ. ex rel. University of South Florida, 342 F.3d 1281, 1289 (11th Cir. 2003).   After Hohbach's promotion, White continued attending production meetings and, because he attended the morning meetings, he was not receiving his assignments from Evans secondhand, unlike Ralston.

At this stage in the litigation, Ralston survives the burden-shifting analysis set forth in McDonnell Douglas Corp.   She has presented a prima-facie case of gender discrimination and presented evidence sufficient to rebut Hohbach's stated reason for terminating her employment. Therefore, Bell Aerospace's motion for summary judgment will be denied on Ralston's Title VII termination claim.

26

Title VII -- Retaliation: To establish a prima-facie case of retaliation, Ralston may show that "(1) she engaged in an activity protected under Title VII; (2) she suffered [a materially adverse] action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).

The Eleventh Circuit Court of Appeals has construed "the causal link element broadly, so that a plaintiff merely has to prove that the protected activity and the ... [adverse] action are not completely unrelated." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (quotation and citation omitted). "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. But mere temporal proximity, without more, must be very close." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) (quotation and citation omitted). Ralston must also show that the decision-maker was aware of the protected

27

activity when taking the adverse-employment action.  <u>See</u>,
<u>e.g.</u>, <u>Brungart v. BellSouth Telecommunications, Inc.</u>, 231
F.3d 791, 799 (11th Cir. 2000).

As Ralston fails to present any meaningful evidence
of a causal connection between her protected activity and
the adverse-employment action, this claim fails.  She
argues that a connection exists between her complaining
to Operations Director West about her pay and her
termination.  In support of this contention, she points
to the fact that West approved of Hohbach's decision to
fire her.  However, Ralston presents no evidence of any
connection between the complaints to West and Hohbach's
decision to fire her.  Most importantly, there is no
evidence in the record that suggests that Hohbach (the
initiator of her termination) was even aware of Ralston's
complaints to West about her pay.  Hohbach stated that he
made the decision to terminate Ralston alone.  Because
she fails to present evidence of a "causal connection
between the protected activity and the adverse employment
action," summary judgment will be granted in favor of

Bell Aerospace on Ralston's Title VII retaliation claim. <u>Crawford v. Carroll</u>, 529 F.3d 961, 970 (11th Cir. 2008).

<u>Equal Pay Act -- Retaliation</u>: Retaliation claims under Title VII and the Equal Pay Act require the same elements. <u>Culver v. Gorman & Co.</u>, 416 F.3d 540, 545 (7th Cir. 2005). Summary judgment will be granted on Ralston's retaliation claim based on the Equal Pay Act for the same reasons that it will be granted on her retaliation claim based on Title VII.

## C. Equal Pay

Ralston claims that, upon her promotion to production-control foreman, she was paid less than her predecessor (Evans) and the other production-control foreman in her division (White), in violation of the Equal Pay Act and Title VII.

<u>Equal Pay Act -- Wage Discrimination</u>: To establish a prima-facie case under the Equal Pay Act, Ralston must show that Bell Aerospace paid different wages to employees of different sexes "for equal work on jobs the

29

performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); <u>see also</u> <u>Arrington v. Cobb</u>, 139 F.3d 865, 876 (11th Cir. 1998). If Ralston establishes a prima-facie case of wage discrimination, the burden shifts to Bell Aerospace to demonstrate that the difference in pay was justified by one of the exceptions listed in the Equal Pay Act. The exceptions are: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex. <u>See</u> 29 U.S.C. § 206(d)(1). If Bell Aerospace meets this burden, then Ralston must rebut the company's explanation by "showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender based differential." <u>Irby v. Bittick</u>, 44 F.3d 949, 954 (11th Cir. 1995).

Even assuming Ralston can meet her prima-facie burden, using White and Evans as comparative employees,

30

she fails to present a violation of the Equal Pay Act. Bell Aerospace contends that the pay difference between Ralston and the other production-control foremen was warranted due to factors other than sex, and Ralston has not rebutted this evidence.  See 29 U.S.C. § 206(d)(1). Bell Aerospace cites differences in the employees' prior experience, seniority, and job performance.

The company points to the prior-work experience of White and Evans in comparison with that of Ralston. Before joining Bell Aerospace, White served in the United States Marine Corps where he coordinated and managed all maintenance operations for the Marine Light Attack Helicopter Squadron, which consisted of over 200 maintenance personnel.  Evans had previously trained with the military in aviation-maintenance courses and had previous supervisory experience with the company.  In comparison, before her time at Bell Aerospace, Ralston worked as a team leader in a business that conducted inventory for large stores and as an assistant manager at

31

a Food World supermarket.  She had no special training in helicopter repair in either of these positions.

Bell Aerospace also argues that the difference in pay between Ralston and Evans is a result of Evans's seniority.  At the time Ralston was promoted to foreman, Evans had worked for Bell Aerospace for over 19 years. He served as the production-control foreman from 2002 until 2007, by which time he earned $ 48,925; when he was originally promoted in 2002 he earned $ 17.42 per hour.[9] Bell Aerospace argues that Ralston was not entitled to receive the same salary Evans earned in 2007 because, at that time, he had already served for over five years as foreman.

Bell Aerospace's final justification for paying Ralston less than White and Evans were paid is her job performance.  The company asserts that Ralston's

---

9. Bell Aerospace's counsel stated at the pretrial conference that his starting salary in 2002 translated to $ 40,500 annually.

32

disciplinary history as well as sub-par performance reviews in certain job duties warranted paying her less.

In response, Ralston argues that these reasons are merely pretext for discrimination. She contends that her six years with the company and her prior experience at Food World show that she was deserving of the same pay as White and Evans. She insists that she received strong performance evaluations prior to becoming foreman and that the foreman position did not require knowledge of helicopters. Moreover, Ralston argues that Evans was once demoted from a supervisory position while at Bell Aerospace, and that she trained Evans when he was first promoted to foreman in the production-control hub's operations. Ralston states, "Any difference in experience and training became irrelevant since any specific training held by Evans and White did not result in any difference in job assignments or [her] ability to do the job that she, Evans, and White shared." Pl.'s Resp. Mot. Summ. J. at 37. The court disagrees.

33

An "individual's experience, training, or ability"
are justifications for pay differentials. <u>Glenn v.</u>
<u>General Motors Corp.</u>, 841 F.2d 1567, 1571 (11th Cir.
1988). While Ralston may think her time with Food World
and her seven years working for Bell Aerospace show equal
experience to White's time with the Marines or Evans's
two decades with the company, all Ralston has done, at
bottom, is "quarrel with the wisdom of [Bell Aerospace's]
reason[s]." <u>Chapman</u>, 229 F.3d at 1030. Ralston's
personal dispute with the company's stated reasons is not
sufficient to support the conclusion that the company's
reasons were "pretextual or offered as a post-event
justification." <u>Irby</u>, 44 F.3d at 954. Therefore,
Ralston's wage-discrimination claim based on the Equal
Pay Act fails.

<u>Title VII -- Wage discrimination</u>: Title VII provides
that, "It shall be an unlawful employment practice for an
employer ... to discriminate against any individual with
respect to compensation ... because of such individual's
race, color, religion, sex, or national origin." 42 U.S.C.

34

§ 2000e-2(a).   Ralston's Title VII wage-discrimination claim is based on the same facts as her Equal Pay Act wage-discrimination claim.  Under Title VII, she must show how "a discriminatory reason more likely than not motivated [Bell Aerospace] to pay her less."   Meeks v. Computer Associates Intern., 15 F.3d 1013, 1019 (11th Cir. 1994) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)).  Therefore, under the Equal Pay Act "the onus is on the employer to establish the pay differential was premised on a factor other than sex," Meeks, 15 F.3d at 1019; whereas "[u]nder Title VII ... the plaintiff must prove that the employer had a discriminatory intent," id.  Ralston has not met this Title VII burden.

Even assuming that Ralston has established a prima-facie case of wage discrimination under Title VII, she has not, for th reason given above, offered sufficient evidence that Bell Aerospace paid her less than White or Evans because of her gender, or that its proffered reasons for the pay differential were pretextual.  Bell Aerospace

35

is due summary judgment on Ralston's claim of wage discrimination under Title VII.

***

Accordingly, it is ORDERED as follows:

(1) Defendant Bell Aerospace Services, Inc.'s motion for summary judgment (Doc. No. 26) is denied on plaintiff Kim Ralston's termination claim based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e to 2000e-17. This claim will go to trial against defendant Bell Aerospace Services, Inc.

(2) Defendant Bell Aerospace Services, Inc.'s motion for summary judgment (Doc. No. 26) is granted on all other claims asserted by plaintiff Ralston, with judgment entered in favor of defendant Bell Aerospace Services, Inc. and against plaintiff Ralston on these other claims.

DONE, this the 14th day of June, 2010.

           /s/ Myron H. Thompson
        UNITED STATES DISTRICT JUDGE